# 25-511

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

ROBERT CARLISLE, individually and as a representative of a class of similarly situated persons, on behalf of the NEW YORK STATE TEAMSTERS CONFERENCE PENSION AND RETIREMENT FUND,

Plaintiff-Appellant,

v.

THE BOARD OF TRUSTEES OF THE AMERICAN FEDERATION OF THE NEW YORK STATE TEAMSTERS CONFERENCE PENSION AND RETIREMENT FUND; JOHN BULGARO; BRIAN K. HAMMOND; PAUL A. MARKWITZ; GEORGE F. HARRIGAN; MARK D. MAY; MICHAEL S. SCALZO, SR.; ROBERT SCHAEFFER; MARK GLADFELTER; SAMUEL D. PILGER; DANIEL W. SCHMIDT; TOM J. VENTURA; MEKETA INVESTMENT GROUP, INC.; and HORIZON ACTUARIAL SERVICES, LLC,

Defendants-Appellees.

## BRIEF FOR PLAINTIFF-APPELLANT

Steven A. Schwartz
**CHIMICLES SCHWARTZ KRINER**
 **& DONALDSON-SMITH LLP**
361 West Lancaster Avenue
Haverford, PA 19041
Tel.: 610-642-8500
sas@chimicles.com

Robert J. Kriner, Jr.
**CHIMICLES SCHWARTZ KRINER**
 **& DONALDSON-SMITH LLP**
2711 Centerville Road, Suite 201
Wilmington, DE 19808
Tel: 302-656-2500
rjk@chimicles.com

*Counsel for Plaintiff-Appellant Robert Carlisle and the Proposed Class*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT ....................................................5

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........6

STATEMENT OF RELATED CASES AND PROCEEDINGS ............7

STATEMENT OF THE CASE...............................................................7

    A.    The Teamsters Pension Plan Faced a Funding Shortfall......................7

    B.    The Trustees Imprudently Engaged Meketa in a Dual, Conflicted Role that Incentivized Meketa to Recommend that the Trustees Take Excessive Investment Risks and Tainted the Trustees' Decision-Making Process.......................................................9

    C.    The Trustees and Meketa Imprudently Allocated Over 50% of Plan Assets to the Highest-Risk Asset Classes...............................10

    D.    Defendants' Bet-The-House Investment Gamble Made the Plan an Extreme Outlier from its Taft-Hartley Peers..........................11

    E.    Defendants Knew the Risks of Their Outsized, Imprudent Gamble..................................................................................13

    F.    The Plan Lost Hundreds of Millions of Dollars Due to Defendants' Imprudent Bet .................................................................15

    G.    The Trustees and Meketa Could Not Have Embarked on and Maintained their Reckless Gamble Without Co-Opting Horizon to Depart from Professional Actuarial Standards and Set and Maintain an Inflated 8.5% Actuarial Return Assumption to Support the High-Risk Asset Return Gamble .....................................17

    H.    The Bet-The-House Gamble Fails, But Defendants Nonetheless Maintained It................................................................21

    I.    The Plan's MPRA Applications Demonstrate the Imprudence

i

of Chasing the 8.5% Return Assumption and that
Horizon Outrageously Kept Two Sets of Books ................................. 22

J.    The Trustees' Misleading Disclosures to Plan Participants
Support Plaintiffs' Breach of Fiduciary Duty Claims ........................ 26

PROCEDURAL HISTORY .............................................................................. 27

A.    Procedural History Leading Up to the Dismissal of the Complaint ... 27

B.    The District Court's Decision Dismissing the Complaint ................. 30

STANDARD OF REVIEW ............................................................................... 33

SUMMARY OF THE ARGUMENT ................................................................ 34

ARGUMENT .................................................................................................... 39

A.    The Complaint Plausibly Alleges that the Trustees and
Meketa Breached Their Fiduciary Duties ........................................... 39

1.    Judge Caproni Upheld Substantially Similar
Imprudence Claims ................................................................ 41

2.    Plaintiff Pleads a Plausible Claim of
Procedural Imprudence ........................................................... 43

a.    The Trustees engaged in an imprudent process .............. 45

b.    The District Court erred in holding that the
Trustees' and Meketa's outlier 8.5% target
investment return and 50% allocation to the
highest-risk asset classes do not plausibly
state a duty of prudence claim ........................................ 48

c.    The District Court erred in holding Plaintiff
failed to plausibly allege that the Trustees' and
Meketa's Asset Allocation created an imprudent
degree of risk, volatility and illiquidity ......................... 55

d.    The District Court's flawed relative

performance analysis ignored critical facts alleged in the Complaint ..................................................62

e.   The District Court's Analysis Regarding Excessive Fees is Flawed ................................................66

f.   The Complaint states an imprudence claim due to Defendants' failure to diversify ......................................68

g.   Defendants' asset allocation violated the Plan's Investment Policy Statement ...........................................71

h.   The Allegations of the Complaint as a whole plausibly allege that Defendants acted imprudently .......72

B.   The District Court Erred in Holding that Plaintiff Failed to Plausibly Allege Horizon Acted as a Fiduciary ..................................73

1.   Fiduciary Status Under ERISA is Broadly Construed and Requires a Fact-Intensive Inquiry ...................74

2.   Plaintiff Plausibly Alleges Horizon Crossed the Line from Actuary to Exercise Control and Provide Advice as a Fiduciary in Plan Asset Management ................................75

C.   Defendants Breached Their Duty of Loyalty and Engaged in Prohibited Transactions....................................80

D.   Co-Fiduciary Liability ........................................................86

CONCLUSION .................................................................87

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Intel Corp.*,
2021 U.S. Dist. LEXIS 12496 (N.D. Cal. 2021) ........................................*passim*

*Apogee Enters. v. State St. Bank & Tr. Co.*,
2010 U.S. Dist. LEXIS 97716 (S.D.N.Y. 2010)....................................78, 79, 80

*Armstrong v. LaSalle Bank Nat'l Ass'n*,
446 F.3d 728 (7th Cir. 2006) ..............................................................................61

*Barchock v. CVS Health Corp.*,
886 F.3d 43 (1st Cir. 2018)...................................................................52, 53, 54

*In re Beacon Assocs. Litig.*,
282 F.R.D. 315 (S.D.N.Y. 2012) ........................................................................77

*Bekker v. Neuberger Berman Grp. LLC*,
2018 U.S. Dist. LEXIS 166690 (S.D.N.Y. 2018)...............................................67

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................34

*Berkelhammer v. Automatic Data Processing, Inc.*,
2022 U.S. Dist. LEXIS 150967 (D.N.J. 2022) ...................................................85

*Bernhard v. Cent. Parking Sys. of New York, Inc.*,
282 F.R.D. 284 (E.D.N.Y. 2012)........................................................................75

*Brown v. Daikin Am., Inc.*,
2021 U.S. Dist. LEXIS 85195 (S.D.N.Y. 2021).................................................84

*United States ex rel. Camburn v. Novartis Pharms. Corp.*,
124 F.4th 129 (2d Cir. 2024) .............................................................................34

*Carrigan v. Xerox Corp.*,
U.S. Dist. LEXIS 70428 (D. Conn. Apr. 18, 2022)...............................82, 83, 84

*Cohen v. Capital One Funding, LLC*,
489 F. Supp. 3d 33 (E.D.N.Y. 2020) ..................................................................31

*Cunningham v. Cornell Univ.*,
  2017 U.S. Dist. LEXIS 162420 (S.D.N.Y., 2017), *aff'd* 86 F.4th
  961 (2d. Cir. 2023), *rev'd on other grounds*, 145 S. Ct. 1020
  (2025) ...................................................................................................*passim*

*Donovan v. Bierwirth*,
  680 F.2d 263 (2d Cir. 1982) .............................................................82

*Forgione v. Gaglio*,
  2015 U.S. Dist. LEXIS 21644 (S.D.N.Y. 2015).........................................75, 78

*Forgione, Allen v. Credit Suisse Sec. (USA) LLC*,
  895 F.3d 214 (2d Cir. 2018) .................................................78, 79, 80

*Gedek v. Perez*,
  66 F. Supp. 3d 368 (W.D.N.Y. 2014)................................................75

*Hughes v. Northwestern Univ*,
  595 U.S. 170 (2022)..........................................................................44, 72

*Hughes v. Northwestern Univ.*,
  63 F.4th 615 (7th Cir. 2023) ...........................................................53

*Johnson v. Parker-Hannifin Corp.*,
  122 F.4th 205 (6th Cir. 2024) .........................................................53

*Kohari v. MetLife Grp., Inc.*,
  2022 U.S. Dist. LEXIS 136505 (S.D.N.Y., 2022).........................................50, 84

*LoPresti v. Terwilliger*,
  126 F.3d 34 (2d Cir. 1997) ...............................................................74

*Mator v. Wesco Dist., Inc.*,
  102 F.4th 172 (3d Cir. 2024) ....................................................49, 53

*McCaffree Fin. Corp. v. ADP, Inc.*,
  2023 U.S. Dist. LEXIS 56362 (D.N.J. 2023) .......................................85

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) .............................................52, 54, 55

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993)..........................................................................74

*Mertens*, *Pappas v. Buck Consultants, Inc.*,
  923 F.2d 531 (7th Cir. 1991) ........................................................74, 80

*In re Morgan Stanley ERISA Litig.*,
  696 F. Supp. 2d 345 (S.D.N.Y. 2009) ..............................................87

*Olsen v. Hegarty*,
  180 F. Supp. 2d 552 (D.N.J. 2001) ....................................................61

*Patterson v. Stanley*,
  2019 U.S. Dist. LEXIS 174832 (S.D.N.Y. 2019).........................64, 65

*Perez v. First Bankers Trust Servs.*,
  210 F. Supp.3d 518 (S.D.N.Y. 2016) ........................................10, 26, 46

*Perkins v. United Surgical Partners Int'l, Inc.*,
  2024 U.S. App. LEXIS 8804 (5th Cir. 2024) ....................................53

*Popovchak v. UnitedHealth Grp. Inc.*,
  692 F. Supp. 3d 392(S.D.N.Y. 2023) ................................................82

*Sacerdote v. New York Univ.*,
  2017 U.S. Dist. LEXIS 137115 (S.D.N.Y. 2017), vacated on other
  grounds, 9 F.4th 95 (2d Cir. 2021) ...............................................65, 83

*Sacerdote v. New York Univ.*,
  9 F.4th 95 (2d Cir. 2021) ...................................................................44

*Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*,
  960 F.3d 190 (5th Cir. 2020) .............................................................53

*Smith v. CommonSpirit Health*,
  37 F.4th 1160 (6th Cir. 2022) ......................................................52, 53

*Snitzer v. Board of Trustees of the American Federation of Musicians,
  et al.*,
  No. 1:17-cv-5361 (S.D.N.Y.) ....................................................*passim*

*Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret.
  Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013) .....................................................*passim*

*Stegemann v. Gannett Co.*,
   970 F.3d 465 (4th Cir. 2020) ...............................................................61

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
   425 F. 3d 119 (2d Cir. 2005) ..............................................................31

*Sweda v. Univ. of Pennsylvania*,
   923 F.3d 320 (3d Cir. 2019) ...............................................................44

*Tibble v. Edison International*,
   575 U.S. 523 (2015)......................................................................51, 56

*Walker v. Merrill Lynch & Co.*,
   181 F.Supp. 3d 223 (S.D.N.Y. 2016) ......................................78, 79, 80

## **STATUTES**

28 U.S.C. §1291 ..................................................................................5

28 U.S.C. § 1331 .................................................................................5

29 U.S.C. § 186(c)(5)(B) ...................................................................45

29 U.S.C. § 1002(38) ...........................................................................9

29 U.S.C. § 1106(b)(3)........................................................................81

29 U.S.C. §§ 1132(a)(2) and (3) .........................................................5

29 U.S.C. § 1132(e)(1)..........................................................................5

## **OTHER AUTHORITIES**

29 C.F.R.2509.75-5.............................................................................75

29 CFR § 2510.3-21(c) .......................................................................77

Asset Allocation and the Investment Return Assumption, American
   Academy of Actuaries (July 2020), available at
   https://www.actuary.org/node/13739 ................................................18

Fed. R. Civ. P. 12 *et seq.*...................................................................*passim*

## INTRODUCTION

Plaintiff Robert Carlisle asserts class claims under ERISA against the Trustees of the New York State Teamsters Conference Pension and Retirement Fund ("Plan"); Meketa Investment Group, Inc., which served in the dual role as the Plan's independent financial advisor and private equity manager; and Horizon Actuarial Services, LLC, which served as the Plan's actuary.

The Plan is a defined benefit multiemployer Taft-Hartley pension plan. JA-I-44, 46-48 (¶¶24, 32-40).[1] The Complaint alleges Defendants breached their fiduciary duties by making and continuing a decade-long reckless investment gamble in an imprudent attempt to address the Plan's rapidly deteriorating funding condition. JA-38 (¶10). The Defendants invested over 50% of the Plan's assets in the highest risk asset classes – emerging market equities, private equity, and other alternative private market investments – to chase an excessive 8.5% target investment return. JA-I-38 (¶10). The gamble also required the Plan to decrease its domestic equity allocation to a minuscule 18% during a raging bull market. JA-I-38, 56, 58-59 (¶¶10, 59, 66-67). Defendants lost their bet and cost the Plan hundreds of millions of dollars.

Both the 8.5% target investment return and the asset allocations were extreme outliers compared to the Plan's Taft-Hartley peers, which Meketa advised was the

---

[1] References to the Joint Appendix are designated as "JA-XX-YY" with XX referring to appendix volumes I-VIII and YY to sequential bates numbers. References to "SA-XX" are references to the Special Appendix.

best benchmark for evaluation of the Plan's investment performance. JA-I-58-59 (¶¶66-67). Defendants doubled and tripled down on their losing bet like gamblers chasing losses, leading to massive cuts (between 19%-29%) of Plan participants' *vested* pension benefits in 2017. JA-I-50 (¶46).

Defendants also breached their fiduciary duties due to structural conflicts and divided loyalties that rendered Defendants' investment process imprudent. The Trustees hired and relied upon Meketa in the dual conflicted role as the Plan's independent investment advisor and private markets manager, resulting in Meketa's annual compensation soaring from $250,000 to $1.4 million, thereby creating an improper incentive for Meketa to recommend making and maintaining the outsized emerging markets and private markets allocations. JA-I-39-40 (¶12). Meketa's conflict was not merely theoretical; it was actualized. In its fiduciary role as the Plan's private markets manager, Meketa recommended that the Trustees increase/maintain the Plan's overweight allocation bets *at the same time* that Meketa was reducing the emerging markets and private markets allocations in its own accounts and advising other plans for which it served as independent financial advisor (but not in the dual conflicted role as private investments manager) due to Meketa's assessment of the risks associated with such investments. JA-I-63(¶75).

The Trustees and Meketa could not have made and maintained their outsized gamble without the active complicity of Plan actuary Horizon. Acting as a truly

independent actuary in compliance with actuarial standards like ASOP 27, Horizon would have limited the Plan's actuarial return assumption to 6.75% for ten years and 7.5% thereafter. JA-VII-2000. But the incongruity between a 6.75% and 7.5% actuarial return assumption and the 8.5% target investment return sought by the Trustees and Meketa would have set off alarm bells with Plan participants and regulators. Accordingly, in response to pressure from the Trustees and Meketa, Horizon abandoned actuarial standards and set the Plan's actuarial return assumption to 8.5% to match the Trustees' and Meketa's desired 8.5% investment return gamble, even though that outsized actuarial assumption was inconsistent with actuarial norms and unprecedented for Taft-Hartley plans and the Plan's dangerous condition. JA-I-53-54.

Worse, Horizon had kept two sets of return assumption books. When the Trustees sought to cut benefits in 2016 pursuant to the Multiemployer Pension Reform Act of 2014 ("MPRA"), Horizon told the Department of the Treasury that the real, ASOP 27-compliant actuarial return assumption was 6.75% for ten years and 7.5% thereafter. JA-VII-2007. By abandoning its role as independent actuary in this manner and acting in concert with the Trustees and Meketa in the outlier investment strategy, Horizon crossed the line from a provider of independent routine actuarial services to an ERISA fiduciary in Plan asset management.

In *Snitzer v. Board of Trustees of the American Federation of Musicians, et al.*, No. 1:17-cv-5361 (S.D.N.Y.) ("*Snitzer*" or "AFM"), the AFM plan trustees, based on advice from Meketa, made a similar (albeit smaller) outsized reckless investment gamble for that similarly-underfunded Taft-Hartley plan. JA-VII-1762 (¶74). After an extensive argument, Judge Caproni denied the AFM trustees' motion to dismiss, holding that "the strategy [the AFM trustees] adopted was so risky that it is outside the bounds of what a prudent fiduciary would do" and that "the fact that this fund was significantly overweighted in volatile and illiquid asset classes (specifically EME and private equity) vis-a-vis it's Taft-Hartley peers, nudges plaintiffs' claim across the line from possible to plausible." JA-VII-1890. Given the similarities of the two complaints, the District Court here should have followed Judge Caproni's cogent analysis. Instead, the District Court largely ignored it.

Indeed, the circumstances here are more extreme and imprudent than in *Snitzer*, because (1) the AFM trustees rejected Meketa's unseemly pitch to serve in the same dual, conflicted role, which their plan counsel described as "bad judgment," particularly since the Department of Labor ("DOL")[2] had sued the trustees of another pension plan for retaining Meketa in the same dual, conflicted role (JA-I-61-62 at ¶¶73-74); and (2) AFM plan actuary Milliman, unlike Horizon, maintained its

---

[2] The DOL launched an investigation that included issues and claims common to those asserted in Plaintiff's Complaint and has entered into a Common Interest Agreement with Plaintiff. JA-VIII-2281.

independence and refused the AFM trustees' request to inflate its actuarial return assumption to match Meketa's excessive target investment return for the AFM plan. JA-I-54-55 (¶56).

Despite the detailed factual allegations in the Complaint, Defendants made a series of arguments seeking dismissal pursuant to Fed. R. Civ. P. 12. The District Court rejected most of Defendants' arguments, but dismissed Plaintiff's Complaint, holding that it failed to state a claim for breach of fiduciary duty against the Trustees and Meketa and failed to allege that Horizon acted as a Plan fiduciary. In doing so, the District Court failed to properly apply Rule 12 standards by ignoring many of the detailed facts alleged in the Complaint, and repeatedly making improper, and often illogical, inferences and internally-inconsistent analyses in favor of Defendants.

Accordingly, this Court should reverse and reinstate Plaintiff's Complaint.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over the subject matter of this ERISA action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. §§ 1132(a)(2) and (3). The District Court rendered a final decision on February 7, 2025. JA-I-97. This Court has jurisdiction pursuant to 28 U.S.C. §1291.

5

### STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court misapplied the Rule 12 pleading standards by ignoring many of the detailed facts alleged in the Complaint, construing inferences in favor of Defendants, parsing the allegations of the Complaint piece-by-piece, and failing to analyze the allegations of the Complaint as a whole?

2.      Whether the District Court erred in holding that the Complaint failed to plausibly allege that Defendants acted imprudently by investing and maintaining over 50% of Plan assets in the highest-risk, illiquid and volatile asset categories and only 18% in domestic equities, even though those allocations were significantly overweighted and underweighted compared to the Plan's Taft-Hartley peers?

3.      Whether the District Court erred in holding that the Complaint failed to plausibly allege that the Trustees and Meketa acted disloyally and engaged in prohibited transactions by hiring Meketa in the dual conflicted role as the Plan's independent investment advisor and private markets manager, resulting in Meketa's annual compensation soaring from $250,000 to $1.4 million, when the DOL and distinguished plan counsel for a Taft-Hartley peer criticized such a dual role as a conflict of interest and Meketa's conflict caused it to make different recommendations to a different Taft-Hartley plan based on its financial interest?

4.      Whether the District Court erred in holding that the Complaint failed to plausibly allege that Horizon crossed the line from independent actuary to

fiduciary by abandoning actuarial standards and keeping two sets of books and setting the Plan's actuarial return assumption to 8.5% to complicitly enable the Trustees' and Meketa's 8.5% investment return gamble when Horizon subsequently admitted to the Treasury Department that an ASOP 27-compliant actuarial return assumption was only between 6.75% for ten years and 7.5% thereafter?

5.      Whether the District Court erred in holding that the Complaint failed to plausibly allege that the Trustees and Horizon acted disloyally and engaged in prohibited transactions by allowing Horizon to keep two sets of assumption books and misleadingly manipulate its actuarial return assumption and funded status calculations provided to participants?

**STATEMENT OF RELATED CASES AND PROCEEDINGS**

This case has not been before this Court previously, and Plaintiff is unaware of any other case or proceeding that is related or about to be presented before this Court or any other court or agency, except that the DOL launched an investigation that included issues and claims common to those asserted in Plaintiff's Complaint and has entered into a Common Interest Agreement with Plaintiff.

**STATEMENT OF THE CASE**

**A.      The Teamsters Pension Plan Faced a Funding Shortfall**

In the aftermath of the 2008 recession, the Plan, like other Taft-Hartley plans, faced a severe shock to its funded status. JA-I-46-47 (¶¶33, 35). By 2010, the Plan

7

was only 62.9% funded, and the Trustees adopted a Rehabilitation Plan. JA-I-47 (¶¶36-37). The Plan's dangerous funded condition (and future promised pensions) were particularly vulnerable to return volatility, as near-term losses result in even greater lost returns in later years due to the loss of the compounding effect, even if greater returns were achieved in later years. JA-I-57 (¶64).

Consistent with a prudent, long-term investment strategy, the Plan's Investment Policy Statement ("IPS") provided: "The investment strategy of the [Plan] is designed to ensure the prudent investment of funds in such a manner as to provide real growth of assets over time while protecting the value of the assets from undue volatility or risk of loss," with objectives "[t]o accept a level of market risk consistent with moderate interim volatility without sacrificing the potential for long term real growth of assets," and "[t]o avoid extreme levels of volatility that could adversely affect the Plan's participants." JA-I-50-51 (¶48); JA-V-1149.

Nonetheless, in response to the funding shortfall, the Trustees panicked, eschewing a prudent investment strategy in favor of a bet-the-house investment gamble unlike any other Taft-Hartley plan (except the AFM plan). The Trustees compounded their own imprudence by compromising the Plan's two most important advisors: its non-discretionary investment consultant, Meketa; and its actuary, Horizon. Not surprisingly, disaster ensued.

**B.     The Trustees Imprudently Engaged Meketa in a Dual, Conflicted Role that Incentivized Meketa to Recommend that the Trustees Take Excessive Investment Risks and Tainted the Trustees' Decision-Making Process**

Before the 2008 recession, Meketa served as the Plan's independent investment consultant with the duty to provide the Trustees with independent advice regarding asset management. JA-I-39-40, 79-80 (¶¶12, 109). Despite the fundamental importance of its independence in advising the Trustees, particularly given the Plan's precarious financial condition, Meketa made an unseemly pitch to also serve as the Plan's discretionary private investments manager. Despite the obvious conflict, the Trustees imprudently retained Meketa in the conflicted dual role,[3] which increased Meketa's annual compensation from $250,000 to $1.4 million, JA-I-39-40, 79-81 (¶¶12, 109-110), and incentivized Meketa to recommend that the Trustees embark on and thereafter maintain the high-risk investment gamble which included outsized allocations to private market investments.

Meketa's unseemly pitch for the dual role was not a one-off. In 2010, Meketa convinced the trustees of the IAM National Pension Fund to hire it in the same dual, conflicted role. Upon discovering Meketa's dual conflicted role, the DOL filed a breach of fiduciary duty action, *Perez v. Roach,* alleging that the trustees of that Taft-

---

[3] Meketa expressly agreed to provide all of its services to the Plan as an ERISA fiduciary and exercised discretion over Plan assets as private markets manager. JA-I-89 (¶135); 29 U.S.C. § 1002(38); JA-II-501.

Hartley plan failed to loyally and prudently select the plan's service providers and created conflicts of interest by hiring Meketa, the plan's independent plan investment consultant, as a discretionary private markets portfolio manager. JA-I-61 (¶73); JA-1954 (*Perez* complaint, ¶64).

Similarly, in 2010, Meketa made the same unseemly pitch to the AFM trustees JA-I-62 (¶74). Recognizing its conflict, Meketa deceptively refused to give AFM plan counsel Proskauer Rose LLP "any solid information" about *Perez* and instead provided "contradictory" information that was "carefully worded and misleading." *Id*. The AFM trustees prudently rejected Meketa's pitch based on the advice of Proskauer, who described Meketa's unseemly pitch as "bad judgment." *Id*.

## C. The Trustees and Meketa Imprudently Allocated Over 50% of Plan Assets to the Highest-Risk Asset Classes

Despite the acute jeopardy to promised pensions given the Plan's dangerous condition and the IPS' binding limits on return volatility exposure, in a reckless gamble designed to address the Plan's rapidly deteriorating funding condition, the Trustees, with the active and extensive complicity of Meketa and Horizon, adopted an unprecedented, high-risk asset management strategy.

The Trustees and Meketa made an imprudent asset allocation decision to chase an outsized 8.5% investment target return. Horizon, in disregard of its applicable professional actuarial standards, adopted an inflated 8.5% actuarial investment return assumption to match Meketa's 8.5% investment target return, even

though that actuarial investment return assumption did not comply with applicable actuarial standards and well-recognized trends.

As reflected by Meketa's 20-year capital market assumptions, the only way to meet or exceed the 8.5% target return required was to make an outsized allocation to international Emerging Markets Equities ("EME"), Private Equity ("PE") and other private market alternative investments, like hedge funds, infrastructure and natural resources (collectively "Alternatives"), with a corresponding decrease to domestic equities. JA-I-54-55 (¶¶55-56).[4] Accordingly, Defendants allocated an imprudent, overweight concentration of Plan assets – over 50% – to EME, PE, and Alternatives, the three highest-risk, highly-volatile and illiquid asset classes. JA-I-56-58 (¶¶59-63, 67). As a result, Defendants reduced the Plan's allocation to U.S. domestic equities – the gold standard for long-term investing – to just 18%. JA-I-58 (¶67).

**D.    Defendants' Bet-The-House Investment Gamble Made the Plan an Extreme Outlier from its Taft-Hartley Peers**

The bet-the-house investment gamble made the Plan an extreme outlier from the Plan's Taft-Hartley peers – which Meketa and Horizon advised the Trustees was the proper benchmark to evaluate the Plan's investment performance. JA-I-53, 57-

---

[4] "In order to continue to assume the Fund's 8.5% target return, the Fund must be significantly invested in asset classes that are expected to outperform 8.5% over long-term periods," and that the only asset classes with a 20-year capital markets assumption exceeding 8.5% were EMEs and PE." JA-I-54 (¶55).

59, 74 (¶¶54.a, 63, 67, 94). Defendants allocated an extraordinary 15% of Plan assets in EME even though the Plan's peer Taft-Hartley group had just 2%. JA-I-56, 58-59 (¶¶61, 67). Likewise, even though PE lacks transparency on performance and valuation and has a high illiquidity risk, the Trustees allocated over 15% to PE, while the Plan's peers only allocated 4%. JA-I-58-59 (¶67). Besides the 30% allocated to EME and PE, Defendants allocated over an additional 15% to other dark private market Alternatives. JA-I-56 (¶61).

What's more, the Plan's 18% allocation to domestic equities was over 56% *less* than the 32% average for the Plan's peers. JA-I-57-59 (¶¶62, 67). While prudent investors profited handsomely by riding out the 2008 financial crisis and holding their domestic equities investments, the Trustees' gamble to underweight domestic equities and overweight the high-risk EME, PE and Alternatives caused the Plan to largely miss out on the decade-long raging bull market.

Besides Meketa's analysis, the authoritative Wilshire Trust Universe Comparison Service for Taft-Hartley plans confirmed the Plan's status as an extreme outlier. JA-I-57 (¶62). So too did independent analyses of Meketa's EME investments for the AFM plan. For example, when AFM hired Gallagher Fiduciary Advisors to advise on the hiring of an Outsourced Chief Investment Officer, Meketa sought the OCIO position. Gallagher criticized the trustees' aggressive asset allocation and recommended against Meketa, calling AFM's "15% emerging

12

markets target [as] very aggressive" and opining that Meketa "made some aggressive strategic and tactical allocation recommendations." JA-VIII-2142-2146 (quotations at 2146). Similarly, another OCIO candidate, SEI Investment Company, criticized the AFM 15% allocation as "too large of an overweight on a risk-adjusted basis" because "EME at 15% can bring too much volatility." *Id.*

### E. Defendants Knew the Risks of Their Outsized, Imprudent Gamble

Meketa repeatedly warned the Trustees: "Relative to the peer universe, the Fund is significantly underweight domestic and international developed market equities, and is significantly overweight to emerging markets and private equity … Compared to peers, [the Plan's] return ranked below the median return of the peer group. This was not surprising given the Fund's relatively large allocation to emerging markets equity and debt compared to peers." JA-I-56, 58-59 (¶¶59, 66-67).

Meketa and the Trustees also knew that the Plan's outlier allocation to EME, PE and Alternatives posed grave risks to the dangerously underfunded Plan and participants' pensions.[5] Meketa repeatedly advised the Trustees that PE and EME were risky, volatile, carried greater fees, and posed a danger of illiquidity…." SA-9

---

[5] *See* JA-I-55 (¶57) ("Based on Meketa Investment Groups long-term expectations, only a handful of asset classes are priced to produce returns above 8% per year [and] [a]ll of these asset classes incorporate a high degree of volatility...all asset classes with high expected returns are likely to underperform their 'safer' counterparts over relatively frequent short term horizons.").

13

Decision at 58. Indeed, the Complaint is replete with refences to those warnings from Meketa, which are universally-accepted. *See* JA-I-39-67 at ¶¶12, 31, 55, 59-60, 66-67 85-86 ("Private market investments involve a significant degree of risk and are suitable only for sophisticated clients who have no immediate need for liquidity of the amount invested and who can afford a risk of loss of all or a substantial part of such investment. …. There is no assurance that such investments will be profitable and there is a substantial risk that associated losses and expenses will exceed income and gains.").[6]

Given the lack of information on the actual performance and costs of the Plan's private markets portfolio investments managed by Meketa,[7] the extent of the Plan's lost returns on Defendants' high-risk PE and Alternatives gamble cannot presently be determined. However, according to the information reported to the

---

[6] Similar warnings were widely disseminated by numerous authoritative sources including the International Monetary Fund ("IMF"), Oxford University, Stanford University, Aon Hewitt, Goldman Sachs, Cliffwater, McKinsey, and Bain & Company. JA-I-69-60, 74-79 (¶¶69, 95-107).

[7] Meketa acknowledged it too lacked information regarding the actual performance of the private markets investments. (JA-I-55-56 at ¶58) ("This [Meketa] report does not contain all the information necessary to fully evaluate the potential risks of any of the [PE] investments described herein. Because of inherent uncertainties involved in the valuations of investments that are not publicly traded, any estimated fair values shown in this report may differ significantly from the values that would have been used had a ready market for the underlying securities existed, and the differences could be material."); JA-I-66-68, 74-79 (¶¶86-87, 95-108). Whether the reported private market returns are real returns or just illiquid paper returns (*i.e.* so-called "internal rates of return") that will disappear when they liquidate cannot be determined at the pleadings stage.

14

Trustees by Fiduciary Counselors, the "internal rates of return" reported by Meketa for the Private Markets Portfolio from 2014 through 2020 failed to achieve Meketa's 20-year capital market assumptions for most of the asset classes. JA-67-74 (¶¶87-94). Moreover, based on publicly available studies, it is unlikely the private markets investment achieved the required reward for the high risk despite putting the Plan in a highly-illiquid position when liquidity was required to meet Plan funding obligations.[8]

Further, the illiquidity of the PE and Alternatives posed a high risk for the Plan if changes to the allocation were required to meet liquidity needs, as admitted by Horizon in the Plan's MPRA applications, discussed below.

### F. The Plan Lost Hundreds of Millions of Dollars Due to Defendants' Imprudent Bet

Defendants' imprudent high-risk investment gamble failed miserably. As the Trustees were warned, the EME experienced high volatility, including *losses* of 15.1% in 2011, 5% in 2013; 10.9% in 2015; 15.4% in 2018, and 7.6% in 2020. JA-I-63-65 (¶¶76-83); JA-633. The over-$200 million invested in EME *lost* approximately $31 million in value from 2014 through 2020. JA-I-64 (¶79). The

---

[8] The high risk in private alternatives demands a premium, such as a 3% premium over the S&P 500 or a 4% premium above the Russell 3000. JA-I-74 (¶95). Studies from authoritative sources ranging from Oxford, Stanford, and Goldman Sachs reflect that PE generally underperformed domestic equity and cost far more and with far higher risk. JA-I-74-76 (¶¶96-99).

impact of the volatility and loss was magnified due to the lack of compounding during the domestic equities bull market. JA-I-57 (¶64). The EME investment also substantially lagged the S&P 500, the Dow Jones Industrial Average ("DJIA") and the Vanguard Balanced Index Fund. JA-I-64-65 (¶81). If Defendants had simply invested the over-$200 million they gambled on EME in the conservative Vanguard Balanced Fund, the Plan would have had more than $200 million more in assets as of 2020. JA-I-65 (¶82).

Meketa's persistence with the extraordinary outlier EME gamble for the Plan was particularly egregious because in 2016, Meketa advised the AFM trustees that due to unacceptable risks, Meketa had eliminated EME from all of its discretionary portfolios and advised the AFM to de-risk its EME portfolio by 40%. JA-I-63 (¶75). Due to its conflicted role and direct interest in the Plan's high risk investment gamble, Meketa apparently did *not* provide same advice to the Teamsters Trustees.

The Plan's PE and Alternatives investments performance, while opaque, underperformed Meketa's capital market return assumptions for the asset classes. JA-I-68-74 (¶¶88-94). In contrast, domestic equity performed exceptionally well, but the Plan lost massive profits due to its minuscule 18% domestic equity allocation.

In sum, the Plan would have had hundreds of millions of dollars more in assets with far less risk if the Trustees had adopted an asset allocation even at the outer

16

edge of the most aggressive end of the range of the portfolios of the Plan's Taft-Hartley peers. JA-I-58-59, 65 (¶¶67, 82).

### G. The Trustees and Meketa Could Not Have Embarked on and Maintained their Reckless Gamble Without Co-Opting Horizon to Depart from Professional Actuarial Standards and Set and Maintain an Inflated 8.5% Actuarial Return Assumption to Support the High-Risk Asset Return Gamble

Actuaries for pension plans are typically fiercely conservative and independent. Horizon, however, abandoned its non-fiduciary lane as the Plan's *independent* enrolled actuary and functioned as a fiduciary by undertaking a central, indispensable role in control of the Plan's *investment* decisions.

As Plan actuary, Horizon was required to determine a reasonable actuarial return assumption for the Plan in accordance with accepted professional actuarial standards independent from the bet-the-house hopes of the Trustees or Meketa. JA-I-51-53 (¶¶50-53). Yet with the Plan dangerously underfunded, Horizon disregarded professional standards and inflated the Plan's actuarial return assumption from 8% to 8.5% to support the Trustees' and Meketa's investment gamble. JA-I-38-39, 47, 51-55, 81, 90 (¶¶11, 35, 50-56, 111, 141).[9] In the post-2008 world, with interest rates and fixed-income returns near zero, an 8.5% per year actuarial investment return

---

[9] JA-I-51-52 ¶51 (Under ASOP 27, the applicable actuarial standard, Horizon's use of long-term return projections was inappropriate "given the critical funded status and negative cash flows"); JA-I-52-53 ¶53.c ("Since the Plan was poorly funded, with significant negative cash flows, Horizon should have considered these factors instead of [long-term return estimates]").

assumption ignored the Plan's dangerous and deteriorating underfunded condition and well-recognized post-2008 actuarial trends to *lower* return assumptions. JA-51-54 (¶¶50-54). At that time actuaries for most Taft-Hartley plans *reduced* their actuarial investment return assumption from 7.5% to 7.2% and lower. JA-I-53-54, 81-82 (¶¶54, 111-15).[10] Indeed, Horizon's own signature "Horizon Survey of Capital Market Assumptions," as well as surveys by others, including Deloitte and Willis Towers Watson, reflected that the prospect of an 8.5% annual investment return was wildly unlikely. JA-I-51-54 (¶¶51, 54). Horizon's own Capital Markets surveys showed a continuing decline in the probability of achieving even a 7.5% return for a benchmark portfolio. JA-51-54 (¶51, 54).

Horizon disregarded applicable professional actuarial standards in order to inflate its actuarial investment return assumption to 8.5% to serve as the primary driver of the Trustees' and Meketa's high risk investment gamble. "Internal Plan

---

[10] According to the National Association of State Retirement Administrators, 96% of public pension plans lowered investment return assumptions since 2010, with the average reduction from 7.52% in 2017 to 7.2% in 2020. JA-I-81 (¶112). Milliman's 2018 Public Pension Funding Study found that "[actuarial return] rates have continued to move lower each year, with a median of 7.25% and ranges from 5% to 8.10%. Actuarial industry professionals recognize that the trend for assumed interest rates is lowering them." JA-I-81-82 (¶¶113-114). *See also* Asset Allocation and the Investment Return Assumption, American Academy of Actuaries (July 2020), available at https://www.actuary.org/node/13739 (confirming trend towards lower actuarial return assumptions, and warning actuaries to resist the "pressure to maintain future return assumptions" from trustees to justify increased investment risk).

documents" show a symbiotic, complicit relationship between Horizon's inflated 8.5% assumption and the 8.5% "target" for the investment allocations and decisions by the Trustees and Meketa. JA-I-50, 52-57 ¶¶47, 52-62.[11]

Horizon knew that raising its actuarial investment return assumption to 8.5% was a necessary component to permit the Trustees and Meketa to embark and persist in their imprudent bet-the-house investment gamble. Indeed, in briefing below, the Trustees admitted that instead of making the required independent judgment about the actuarial return assumption based on the Plan's condition and experience, Horizon improperly reverse engineered a long-term (20-year) actuarial return assumption to match the Trustees' and Meketa's target "investment return objective of 8.5%." *See* JA-I-245 ("As a result of this revised asset allocation, Horizon, the Fund's consulting actuary, increased its assumed actuarial rate of return…from 8% to 8.5%….").

Had Horizon maintained its independence and actually functioned as an independent actuary, the Trustees and Meketa would not have been able to maintain

---

[11] The Plan documents submitted to the District Court, which Plaintiff obtained from the Plan by a pre-Complaint request under ERISA, provide specific support for the Complaint's allegations regarding "Internal Plan documents. *See* JA-VII-1970 ("The Fund's actuarial target return is 8.5%" and its "allocation policy is projected to produce an annual return of 8.8%"); JA-VII-1973 ("The Fund's actuarial target return is 8.5%" and its "allocation policy is projected to produce an annual return of 8.6%"); JA-VII-1976 ("The Fund's actuarial target return is 8.5%" and its "allocation policy is projected to produce an annual return of 8.9%").

their imprudent asset allocation. The incongruity of a large gap between the Trustees' and Meketa's target investment return for the Plan's asset allocation and Horizon's actuarial return assumption for reporting the Plan's funded condition would have created a red flag for Plan participants and regulators, particularly since the Plan would be seeking approval from the Treasury Department for MPRA benefit cuts. JA-I-49-50 (¶¶44-45). Thus, it is not surprising that the Trustees and Meketa co-opted Horizon to inflate its actuarial return assumption to facilitate their reckless investment gamble. What is surprising is that instead of maintaining its independence, Horizon complied and acted in concert to support the Trustees' and Meketa's imprudent strategy to chase the risky, excessive 8.5% target rather than providing independent actuarial information to the Plan participants. Under similar circumstances, Milliman, the actuary for the similarly-underfunded AFM plan, maintained its independence and refused the AFM trustees' requests to increase its 7.5% actuarial return assumption based on the AFM trustees' similar EME/PE allocation. JA-I-54-55 (¶56).

Actuarial standards, including ASOP 27, require actuaries to consider a number of factors in determining the investment return assumption. JA-I-51-53 (¶¶51-53). A reasonable estimate of the long-term net investment return for the Plan's policy and allocation is but one factor. *Id*. The Plan's funding condition must also be considered. *Id*. As discussed below, Horizon's stark departure from its role

as the Plan's independent actuary into a member of the Plan's asset investment team is vividly shown by Horizon's own work and explanations of its lower return assumptions (JA-49-50 at ¶¶ 44-45), which Horizon certified in support of the Plan's 2016 application to the Treasury Department ("Application") to cut vested pension benefits pursuant to MPRA, and its Revised Application in May 2017. Those Applications reflect that Horizon concluded and certified that a proper application of ASOP 27 for the Plan results in a return assumption of 6.75% for 10 years and 7.5% thereafter. *See* JA-II-361, JA-VII-2000.

### H. The Bet-The-House Gamble Failed, But Defendants Nonetheless Maintained It

Defendants' high-risk asset gamble experienced crushing volatility (thereby losing out on the compounding of early returns) and failed to produce the gambled-for returns. Despite the raging domestic equity bull market, the Plan's investment returns lagged its Taft-Hartley peers and other relevant benchmarks due to the outlier allocation. JA-I-58-59, 64-65 (¶¶67, 81). The Plan's funded ratio (assets/pension liabilities) fell from approximately 63% for 2010 to 45.6% for 2015, and the Plan fell into "Critical and Declining" status under the Pension Protection Act of 2006, and was projected by Horizon to become insolvent. JA-I-46-48 (¶¶32-39).

21

**I.** **The Plan's MPRA Applications Demonstrate the Imprudence of Chasing the 8.5% Return Assumption and that Horizon Outrageously Kept Two Sets of Books**

Horizon's certified conclusions of lower return assumptions in the Plan's MPRA Applications reflect Horizon's active complicity in the Trustees and Meketa in the bet-the-house asset gamble. JA-49-50, 51-54 (¶¶42-45, 50-55).

In their original 2016 MPRA Application, the Trustees stated they had taken steps to address funding for longer than ten years, including an unusual investment asset allocation and strategy that enabled the Plan "to maintain an 8.5% investment return assumption." *See* JA-I-49-50 (¶44); JA-2118 & 2119. But in the 2016 Application, Horizon properly applied the professional actuarial standard, ASOP 27, and certified that the true actuarial return assumption for the Plan, in light of its condition, was 6.75% for 10 years and 7.5% thereafter. JA-I-49-50 (¶¶44-45); JA-VII-2034, 2041. Based on the projection for assets to decline in the earlier years even with benefit suspensions, Horizon also stated that the return assumption "should have a short-term expectation" and should "include some margin for adverse deviation." JA-VII-2001, 2006, 2008, 2040, 2042. Horizon applied downward adjustments required by ASOP 27 based on (1) the Plan's projected negative cash flow and declining asset values even following the benefit suspensions, resulting in the funded percentage being projected to decline for many years before it began to improve; (2) the greater materiality of asset returns in the early years due to the

Plan's severely negative cash flow; and (3) possible changes to the asset allocation to increase liquidity and decrease volatility, which is more likely as time goes on due to the likelihood of an unfavorable event and the projected decline of the funded percentage before stabilizing with the benefit suspensions. JA-VII-2005, 2007.[12]

Plaintiff alleges that Horizon disregarded applicable professional standards including ASOP 27 and the Plan's dangerous condition to inflate the return assumption to 8.5% to support the high-risk asset gamble. JA-I-51-52 at ¶51 (use of 10-year projections vs. 20-year projections was appropriate given critical funding status and negative cash flows); JA-I-52-53 at ¶53.c (Horizon should consider plan's liquidity needs and poor funding instead of long-term return assumptions). By certifying in the 2016 MPRA Application that the proper actuarial return assumption was 6.75% for 10 years and 7.5% thereafter under ASOP 27, Horizon effectively admitted that it had done what Plaintiff alleges: inflated and maintained a bogus and misleading 8.5% actuarial return assumption during the preceding years in disregard of applicable standards and the Plan's condition to provide the primary driver of the imprudent high risk investment gamble. In essence, Horizon kept two sets of books, an outrageous fiduciary breach.

---

[12] These factors were known by Horizon long before the Application. JA-I-46-49 (¶¶32-42) (Plan experienced declining funding percentage and negative cash flows for years; funded ratio fell from 62.88% in 2010 to 45.8% in 2015).

The Treasury Department questioned the incongruity between Horizon's use of the lower (6.75%-7.5%) return assumptions in the MPRA Application compared to Horizon's 8.5% return assumption used in the certifications submitted in reports filed by the Trustees and Horizon before the 2016 Application. JA-I-49-50 (¶¶44-45). In response, the Trustees withdrew the 2016 Application, JA-I-49-50 (¶44), and submitted a Revised Application in May 2017, JA-I-50 (¶45). In the Revised MPRA Application, Horizon again certified that 6.75%-7.5% was the ASOP 27-complaint return assumption for the Plan. JA-II-363. To explain the incongruity with its prior 8.5% certifications, Horizon represented that based on discussions with Meketa and the Trustees, Horizon "assumed" that the Trustees and Meketa would make specific changes to move the Plan assets to a less volatile and more liquid long-term asset allocation over a five-year period, including lowering EME from 16% to 9%, and lowering PE from 15% to 10%. JA-VII-2065, JA-VIII-2091. Horizon determined an appropriate return assumption to be between 6.83% and 7.77% through 2049, based on the Plan's condition and experience, and the "assumed" changes to the asset allocation.

In September 2017, Treasury approved the Trustees' request for a cruel 29%, reduction in the *vested* pension payments for retired participants and a 19% reduction for active participants (in addition to the reductions previously implemented under the Rehabilitation Plan). JA-I-50 (¶¶45-46). The average cut for a retired participant

was approximately $2,000-$5,000. JA-I-50 (¶46). Plaintiff Carlisle's vested pension benefits were cut by over $5,000 from 2017-2022. JA-VIII-2174.  By year-end 2017, the Plan was nevertheless projected to be insolvent by 2026. JA-II-319.

Notwithstanding the continuously mounting evidence that the bet-the-house asset allocation failed and was dangerously imprudent, Defendants maintained it following the MPRA benefit cuts. JA-I-56 (¶61). Moreover, despite their promise to Treasury and Plan participants in the Revised MPRA Application, Defendants stubbornly maintained the bogusly-inflated 8.5% per year actuarial return assumption and the excessive EME and PE allocations at 15% and 21%, respectively. *Id*.; JA-IV-1000, JA-VII-1979, JA-VIII-2095, 2098.

After the filing of the Complaint, Defendants' imprudent outlier investment strategy continued to fail and the only thing that saved the Plan from immediate insolvency was the receipt of over $1 billion of taxpayer money as part of the American Rescue Plan Act ("ARPA") bailout of underfunded pension plans. SA-15; ECF 179-1 at 14; ECF 179-2 at ¶4; ECF No. 179-3. Despite that extraordinary cash infusion, the Trustees admitted that "the financial stability and long-term financial health of the [F]und" is still at risk.  JA-VIII-2150. The Trustees also admitted that ARPA provided no repayment of interest on the 19%-29% MPRA benefit cuts or any repayment of MPRA benefit cuts for surviving spouses or other dependents of Plan participants. JA-215.

25

**J.     The Trustees' Misleading Disclosures to Plan Participants Support Plaintiffs' Breach of Fiduciary Duty Claims**

Despite knowing that their high-risk asset gamble failed and the Plan was heading towards insolvency (JA-I-48 at ¶38), the Trustees misrepresented: "the most important question from participants and beneficiaries is whether there will be sufficient money to pay pension benefits that have been earned and promised. The simple answer is: Yes! Based on the best information and advice from Horizon and Meketa, the Trustees have taken the necessary steps to ensure that there will be assets to pay the pensions." JA-I-48 ¶39. The Trustees repeated that misrepresentation in 2014. JA-I-48-49 (¶40).

The Trustees also made misleading statements in presentations to Plan participants regarding the MPRA Application. JA-II-251. For example, the Trustees touted that they hired Meketa to "provide independent investment fiduciary services" without disclosing Meketa's dual, conflicted role or the DOL's *Perez* lawsuit excoriating such a dual, conflicted role. JA-281. The Trustees represented that the "asset diversification" of the portfolio is "required by ERISA" and that the Plan's "investments [are] not concentrated in any one asset class" with "no more than 20% in any one asset class" in order to "limit risk from overexposure to any single asset class," without disclosing that their asset allocation was an extreme outlier compared to peer Taft-Hartley plans with an outsized allocation of 50% to the highest risk asset classes and that as a result the Plan's returns lagged those of

26

peer plans. JA-II-283. The discussion of PE is devoid of any discussion of PE risks including the extensive risk the high private markets concentration posed given the Plan's liquidity needs. JA-286. The Asset Class Overviews (JA-II-286-288) and the accompanying chart (JA-II-289) comparing the five-year returns of the various asset categories misleadingly omits EME to avoid disclosure of the Trustees' disastrous EME bet and lumps domestic equities into a broad "global equity" category class to support the misleading claim that "private equity, infrastructure and real estate significantly outperformed other major asset classes over the past five years," even though domestic equities outperformed all categories. The chart that purportedly reflects that "top performing asset classes rotate regularly" (JA-II-302) makes domestic equities seem like a laggard (since it was only the "top" performing asset class in two years) while making EME seem like the leading top performer by listing only its strong years without showing the extreme volatility and that virtually every other year EME had disastrous results and had disastrous results overall. Critically, nowhere do the Trustees disclose that their asset allocation is an extreme outlier.

## PROCEDURAL HISTORY

### A.  Procedural History Leading Up to the Dismissal of the Complaint

Plaintiff filed the Complaint in the SDNY in October 2020. JA-I-34. In January 2021, Defendants filed a motion to transfer the case to the NDNY, arguing, *inter alia*, that "considerations of court congestion also favor the Northern District."

JA-I-165. In April 2021, the Southern District granted the motion and transferred the case to the Northern District. JA-I-168.

In mid-2021, the Trustees, Meketa and Horizon filed separate motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) JA-I-179, 239, JA-II-494 (ECF Nos. 102, 124-125) along with a motion to stay proceedings, arguing that the then-recently enacted ARPA "prescribes an administrative process that will allow the Fund to apply for and receive federal funding to restore previously reduced benefits" and that if the "federal funding is received and benefits are restored, Plaintiff's claims will most likely be moot due to the lack of any conceivable individual 'harm' necessary to support constitutional standing." JA-I-235 (quotation at JA-236).

Plaintiff opposed the motion to stay, pointing out that he had concrete, redressable damages because (1) even if ARPA eventually provided Plan participants a full repayment of the 19% and 29% MPRA cuts to their vested pension benefits, the collateral source rule would not eviscerate their entitlement to a payment of damages from Defendants or provide Defendants with an offset to damages, and (2) in any event, ARPA payments, at best, would only provide Plan participants with payments equal to the amount of the MPRA benefit cuts, but without interest or investment returns, up to a decade after their monthly pension benefits were reduced. JA-I-25 (ECF No. 143 at 5-6, 10 & n.8); JA-I-30 (ECF No. 181 (*passim*); JA-VIII-2174 (ECF No. 181-1) (reflecting Plaintiff's interest damages

would exceed $1,200 and classwide interest damages would exceed $74 million); ECF 140 at 32 (reflecting Plaintiff suffered 19% cut to his vested pension benefits). Nonetheless, in February 2022, the District Court granted the motion to stay, reasoning that "if PBGC grants the Fund's application for special financial assistance, Plaintiff's benefits may be restored in their entirety" and that "Plaintiff's arguments do not suggest that a *short delay* in this case while the Fund's application is under consideration would be prejudicial." JA-I-25 (emphasis added).

While the motions to stay and dismiss were pending, Plaintiff requested the production of documents Defendants produced to the DOL as part of its investigation, and applicable insurance policies. JA-VIII-2164, 2166 (ECF Nos. 169, 177). Despite the lack of any burden on Defendants in producing such limited discovery, in July 2022, the District Court stayed discovery pending resolution of the motions to dismiss. JA-I-28.

Approximately one year later, in June 2023, the District Court scheduled oral argument on the motions to dismiss for July 28, 2023. Even though the parties had requested oral argument on all issues raised in the motions, the District Court limited argument to the issues of standing, mootness and whether MPRA somehow provided Defendants with a release of all breach of fiduciary duty claims (but not issues relating to the breach of ERISA's duty of prudence and loyalty). JA-I-30 (ECF No. 189). At the outset of the hearing, the District Court reiterated the limitations on the

scope of the argument and repeated those limitations during course of the argument (*see* JA-I-30, JA-VIII-2179), so the District Court never had the benefit of hearing the parties' arguments on *any* of the issues that resulted in its dismissal of the Complaint.

## B.     The District Court's Decision Dismissing the Complaint

In February 2025, over 18 months after the July 2023 argument hearing, the District Court issued its Memorandum Decision and Order dismissing the Complaint with prejudice (without leave to replead) and directing the Clerk to close the case. JA-I-67.

The District Court denied Defendants' Rule 12(b)(1) motions, which encompassed all of the bases (*i.e.,* mootness, standing, redressability, and one-satisfaction rule) for the District Court's July 2022 stay of even the limited discovery sought by Plaintiff. JA-I-65. In doing so, the District Court accepted Plaintiff's argument that, as a matter of law, the collateral source rule made any ARPA repayments of benefit cuts irrelevant. SA-16-29. The District Court therefore found it unnecessary to address Plaintiff's interest arguments (JA-I-17 & n.15), which clearly provided and alterative basis as a matter of law to reject Defendants' Rule 12(b)(1) arguments. *See* JA-I-25, 30 (ECF Nos. 143, 181 & 181-1).

With respect to the Rule 12(b)(6) motions, the District Court also summarily rejected, as a matter of law, Defendants' argument that MPRA somehow provided

Defendants with a release of liability in connection with the Defendants' imposition of the 19% and 29% cuts to Plan participants vested pension benefits. SA-35-37.

With respect to the core ERISA fiduciary claims for breach of the duties of prudence, loyalty, diversification and compliance with the governing Plan document, the District Court first evaluated which of the approximate 50 exhibits that the parties submitted were properly considered per Rule 12(b)(6). SA-30-34.[13]

Next, the District Court held that Plaintiff's Complaint failed to plausibly allege claims for breach of the duties of prudence, loyalty, diversification and

---

[13] The District Court refused to consider: the 2016 MPRA Application, stating there was only a "minor reference" to it in the Complaint and because Plaintiff provided only an excerpt (SA-33); the Revised MPRA Application (which was submitted by the Trustees, JA-II-315, and the Court determined it properly could be considered SA-31) because Horizon asserted a different interpretation of the document than Plaintiff (SA-31-32); and Internal Plan documents as not incorporated by reference into the Complaint or relied upon "heavily on their terms and effects." SA-33. Those documents, which were submitted without objection, were properly part of the Rule 12 record because they are integral to and expressly referenced in the Complaint in support of specific allegations, *See* JA-I-34 at ¶¶43-45, 50-54 (the MPRA Applications); JA-I-34 at ¶¶47, 55-59, 63, 65-67, 71-72, 75, 86, 87 (summaries of "Internal Plan documents"). *See Cohen v. Capital One Funding, LLC*, 489 F. Supp. 3d 33, 46 (E.D.N.Y. 2020) ("Facts drawn from integral documents, even those not expressly incorporated by reference, are fair game in the context of a Rule 12(b)(6) motion"); *Subaru Distribs. Corp. v. Subaru of Am., Inc.,* 425 F. 3d 119, 122 (2d Cir. 2005) (ambiguities in documents relied upon and integral to complaint should be resolved in favor of plaintiff on motion to dismiss)' 1 Federal Litigation Guide § 3.93 (when deciding a 12(b)(6) motion, the court may consider matters the judge may take judicial notice under Federal Rule of Evidence 201 and public records). The Trustees submitted the Revised MPRA Application and asserted that "Plaintiff's express reference to external documents makes it appropriate for the Court to now consider them," and that the Revised MPRA Application is "publicly available" on the Plan website. JA-I-243-244 n.1 (citing cases).

compliance with the governing Plan document. SA-37-65. In doing so, the District Court gave little weight to Judge Caproni's decision denying defendants' Rule 12(b)(6) motion in *Snitzer*, even though the issues were "very similar" to those raised in Defendants motions here (SA-49 & n.24), and even though, as discussed below, the facts here are far more detailed and egregious than those pleaded in the *Snitzer* complaint. Nor did the District Court meaningfully address many of the detailed facts alleged in the Complaint. Moreover, the District Court did not properly construe reasonable inferences in Plaintiff's favor, or properly construe Plaintiff allegations as a whole, or properly account for the fact that ERISA claims may withstand a motion to dismiss based on sufficient circumstantial allegations since ERISA plaintiffs generally lack the inside information necessary to make out their claims prior to discovery. In many instances, the District Court did the opposite. And much of the District Court' reasoning was internally inconsistent with other parts of its decision.

The District Court also dismissed the claims against Horizon based on the conclusion that Horizon was not an ERISA fiduciary because "Plaintiff's allegations solely concern Horizon's provision of actuarial services… to the Plan" and Plaintiff failed "to plausibly allege that Horizon had any discretion, authority, or control over the management of the Plan." SA-38. In drawing these conclusions, the District Court did not meaningfully address Plaintiff's allegations that (1) Horizon

32

essentially kept two sets of books with an inflated 8.5% actuarial return assumption (which failed to comply with ASOP 27) in order to support the imprudent high-risk asset management gamble, and a second (ASOP 27-compliant) actuarial return assumption of 6.75% for ten years and 7.5% thereafter (for the same plan with lower payment obligations) that it certified to Treasury in support of benefit cuts under MPRA; (2) that the incongruence between a 6.75%-7.5% actuarial return assumption and an 8.5% investment return target would have set off alarm bells with Plan participants and regulators (which proved true since Treasury challenged the incongruity in the Plan's first MPRA application); (3) that the Trustees and Meketa could not have pursued their excessively-risky and unprecedented investment allocation but for Horizon's abandonment of its independence and professional responsibilities to inflate the actuarial return assumption to serve as a primary driver of the imprudent high risk asset gamble, and (4) that when similarly pressured by the AFM trustees and Meketa, AFM plan actuary Milliman refused to abandon its independence and professional responsibility and continued to provide a professionally-appropriate actuarial return assumption.

On March 3, 2025, Plaintiff timely filed his Notice of Appeal. JA-VIII-2284.

## STANDARD OF REVIEW

This Court reviews a dismissal order pursuant to Federal Rule of Civil Procedure 12(b)(6) *de novo*, "accepting … all factual allegations as true and drawing

all reasonable inferences in favor of the plaintiff." *United States ex rel. Camburn v. Novartis Pharms. Corp.*, 124 F.4th 129, 135 (2d Cir. 2024). To survive a motion to dismiss, a complaint must only plead sufficient facts to "state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## SUMMARY OF THE ARGUMENT

The District Court's decision dismissing the Complaint failed to properly apply Rule 12 standards by ignoring many of the detailed facts alleged in the Complaint, making improper, and often illogical, inferences and internally-inconsistent analyses in favor of Defendants, and misconstruing or relying on inapposite cases.

The Complaint contains detailed facts demonstrating that the Teamsters Pension Plan's Trustees, Meketa Investment Group, which served in the dual role as the Plan's independent financial advisor and private equity manager, and Horizon Actuarial Services, which served as the Plan's actuary, each breached their fiduciary duties under ERISA by acting imprudently, disloyally, and engaging in prohibited transactions.

**Imprudent Investment Allocation Gamble**: Defendants made a decade-long reckless investment gamble in an imprudent attempt to address the Teamsters Pension Plan's rapidly deteriorating funding condition. They invested over 50% of the Plan's assets in the highest-risk, volatile and illiquid asset classes – emerging

market equities ("EME"), private equity ("PE"), and other alternative private market investments – to chase an excessive 8.5% target investment return. The gamble also required the Plan to decrease its domestic equity allocation to a minuscule 18% during a raging bull market. Defendants lost their bet and cost the Plan hundreds of millions of dollars.

Both the 8.5% target investment return and the asset allocations were extreme outliers compared to the Plan's Taft-Hartley peers, which Meketa advised was the best benchmark to evaluate the Plan's investment performance. The Plan's Taft-Hartley peer plans allocated just 2% in EME; just 4% to PE; and far less in Alternatives. What's more, the Plan's 18% allocation to domestic equities was over 56% *less* than the 32% average for the Plan's peers.

Defendants doubled and tripled down on their losing bet like gamblers chasing losses, leading to massive cuts (between 19%-29%) of Plan participants' *vested* pension benefits.

**Defective Process and Disloyalty Due to Conflicts**: Defendants impudent, losing investment allocation gamble was the product of a defective decision-making process riddled with structural conflicts and divided loyalties.

**Meketa**: The Trustees hired and relied upon Meketa in the dual conflicted role as the Plan's independent investment advisor and private markets manager, increasing Meketa's annual compensation by more than $1 million, thereby creating

an improper incentive for Meketa to recommend making and maintaining the outsized EME and private markets allocations. Meketa acted on that incentive by recommending that the Trustees increase/maintain the Plan's overweight allocation bets *at the same time* that Meketa reduced the emerging markets and private markets allocations in its own accounts and advising other plans (where it had no conflicted incentive)to de-risk their allocations due to Meketa's assessment of the risks associated with such investments. The Department of Labor sued the trustees of another Taft-Hartley Plan for imprudently hiring Meketa in the same dual, conflicted role, and Proskauer, distinguished plan counsel for the AFM (Musicians) Taft-Hartley plan criticized Meketa's "bad judgement" for seeking to serve in the same dual, conflicted capacity.

**Horizon**: The Trustees and Meketa could not have made and maintained their outsized gamble without the active complicity of Plan actuary Horizon. Acting as a truly independent actuary in compliance with actuarial standards like ASOP 27, Horizon would have limited the Plan's actuarial return assumption to 6.75% for ten years and 7.5% thereafter. But the incongruity between a 6.75%-7.5% actuarial return assumption and the 8.5% target investment return sought by the Trustees and Meketa would have set off alarm bells with Plan participants and regulators. Accordingly, in response to pressure from the Trustees and Meketa, Horizon abandoned actuarial standards and certified an artificially-inflated actuarial return

assumption to 8.5% to match the Trustees' and Meketa's 8.5% investment return gamble, even though that outsized actuarial assumption was inconsistent with actuarial norms and unprecedented for Taft-Hartley plans. Worse, Horizon had kept two sets of books. When the Trustees sought approval for MPRA benefits cuts, Horizon told the Treasury Department that the true, ASOP 27-compliant actuarial return assumption was 6.75% for ten years and 7.5% thereafter. JA-II-361. When Treasury questioned the incongruity between Horizon's lower return assumptions in the MPRA Application compared to 8.5% return assumption Horizon certified in in numerous reports filed by the Trustees and Horizon before the MPRA Application, the Trustees abruptly withdrew the 2016 Application and submitted a Revised Application where Horizon again certified that 6.75%-7.5% was the ASOP 27-complaint return assumption for the Plan. To explain the incongruity with its prior 8.5% certifications, Horizon, the Trustees and Meketa represented that they would significantly decrease the Plan's EME and private markets allocations after approval of the benefit cuts, but they never did so. By abandoning its role as independent actuary in this manner and acting in concert with the Trustees and Meketa in the outlier investment strategy, Horizon crossed the line from a provider of independent, routine actuarial services to an ERISA fiduciary that exercise control and undue influence and provided advice with respect to the Plan's investment decisions.

Plaintiff's Complaint supports these allegations with detailed facts from Plan documents and regulatory filings and reports from Meketa and Horizon; actions by the Treasury Department and DOL; Taft-Hartley asset-allocation and actuarial assumption analyses by Horizon, Wilshire, Oxford and Stanford universities, Cliffwater's Comprehensive Annual Financial Pension Plan Reports, Goldman Sachs, AON Hewitt, the National Association of State Retirement Administrators, and Milliman (*see* JA-I-74-76, 81 at ¶¶96-100, 112-113); and the considered opinion and actions by Proskauer, AFM Plan actuary Milliman, and distinguished actuarial expert David Pitts of Independent Actuarial Services.

These detailed factual allegations amply demonstrate that Plaintiff's breach of fiduciary duty claims easily satisfy the Rule 12 plausibility standard. Indeed, in a case alleging that the AFM plan trustees, based on advice from Meketa, made a similar (albeit smaller) outsized reckless investment gamble for that similarly-underfunded Taft-Hartley plan, Judge Caproni denied the AFM trustees' motion to dismiss, holding that "the strategy [the AFM trustees] adopted was so risky that it is outside the bounds of what a prudent fiduciary would do." Judge Caproni's analysis proved prescient: the facts revealed in discovery proved so damming Judge Caproni refused to let the AFM trustees even file a summary judgment motion and the case settled for almost $27 million shortly before trial.

This Court should follow that cogent reasoning, reverse the District Court's decision, and reinstate the Complaint.

## ARGUMENT

### A.   The Complaint Plausibly Alleges that the Trustees and Meketa Breached their Fiduciary Duties

The Teamsters Trustees breached their fiduciary duties by (1) hiring and relying on Meketa in the dual, conflicted role as the Plan's purportedly independent financial advisor and private markets investments manager, where Meketa had an incentive to recommend excessive investments in the highest-risk and most-expensive asset classes to line its own pockets and withhold disclosure to the Trustees that Meketa took the opposite position with respect to its own holdings and those of clients for which Meketa did not serve in a conflicted, dual role; (2) chasing an excessively-risky 8.5% target investment return and an asset allocation that invested over 50% of Plan assets in the highest-risk and most expensive asset classes that was far outside the range of asset allocations of the Plan's Taft-Hartley peers and resulted in an absurdly-low 18% allocation to U.S. domestic equities; (3) successfully pressuring Plan actuary Horizon to abandon its independence and professional standards to inflate the Plan's actuarial return assumption to 8.5% while Horizon knew (as it certified in the Plan's Applications to cut benefits) that an ASOP-27 complaint actuarial return assumption was 6.75% for ten years and 7.5% thereafter; (4) acting like drunken gamblers who double and triple down, as their

39

gamble failed and losses mounted, by maintaining the Plan's outlier, excessively-risky asset allocation in the face of numerous warnings, losses and lagging returns as the Plan continued to deteriorate deeper toward insolvency, and (5) misleading, if not outright lying to, Plan participants and the Treasury Department about the Plan's target investment return, actuarial investment return assumption, and the Plan's financial condition, to conceal their imprudent investment bets.

Meketa, which agreed to fiduciary status in both of its roles, breached its fiduciary duties for the same reasons, and for the additional reason that it advocated for the Teamsters Trustees to persist in the imprudent asset allocation while at the same time taking the opposite position with respect to its own holdings and those of clients like AFM where Meketa did not serve in a conflicted, dual role.

Plaintiff's Complaint supports these allegations with robust detailed facts from the Plan's documents and regulatory filings; actions by the Treasury Department and DOL; Taft-Hartley asset-allocation and actuarial assumption analyses by Horizon, the Wilshire Trust Universe Comparison Service, Meketa (who told the Trustees that the Plan's allocation significantly diverged from its "peer universe"), Oxford and Stanford universities, Cliffwater's Comprehensive Annual Financial Pension Plan Reports, Goldman Sachs, AON Hewitt, the National Association of State Retirement Administrators, and Milliman (*see* JA-I-74-76, 81 at ¶¶96-100, 112-113); and the considered opinion and actions by distinguished

AFM Plan counsel Proskauer, distinguished AFM Plan actuary Milliman, and distinguished actuarial expert David Pitts of Independent Actuarial Services. JA-I-54-55, 62-63, 81-82 (¶¶56, 74-75, 113, 114).

These detailed factual allegations amply demonstrate that Plaintiff's breach of fiduciary duty claims easily satisfy the Rule 12 plausibility standard.

### 1. Judge Caproni Upheld Substantially Similar Imprudence Claims

Faced with far-less detailed facts of imprudence in the complaint in *Snitzer*, Judge Caproni denied the AFM trustees' motion to dismiss substantially similar claims as those alleged here. JA-VII-1888-1892. With the benefit of the factual and expert record developed in *Snitzer*, which settled for almost $27 million shortly before trial (JA-VII-1906-1915, 1926, 1929), the Complaint here provides far more factual detail based on far more extreme facts than alleged in the *Snitzer* amended complaint. JA-VII-1762.[14]

---

[14] In *Snitzer*, the AFM trustees rejected Meketa's pitch to serve in a dual, conflicted role; AFM actuary Milliman did not keep two sets of books and refused to inflate its actuarial return assumption to match the AFM trustees'/Meketa's excessive AFM target investment return (which was only 8%, not 8.5%); the AFM plan trustees only invested about 33% of assets in the highest-risk asset classes (JA-VII-1802 at ¶86), compared to the more than 50% by the Teamsters Trustees (JA-VII-1792, 1801 at ¶60, 84); and the AFM plan, while in critical and declining status, did not require MPRA benefit cuts prior to receiving ARPA bailout money. Moreover, the *Snitzer* complaint did not cite to the various studies by Horizon, Wilshire, Cliffwater and others reflecting how far out of the box the Teamsters Plan's asset allocation was compared to its peers.

As in *Snitzer*, Plaintiff here "has alleged specific information that was available to the fund regarding the near term [sic] risk of investing in emerging market equities which … should have caused a prudent fiduciary to limit the fund's near term [sic] exposure to such investments." JA-VII-1889. Judge Caproni rejected the AFM trustees' arguments that "the decision to invest substantial funds in emerging markets and private equity was not a breach of their fiduciary duty but was instead a reasoned decision by the trustees to increase the probable returns to the fund, even though that meant taking on additional risk to maintain the long term [sic] solvency of the fund" (JA-VII-1890), because the "question is whether the strategy they adopted was so risky that it is outside the bounds of what a prudent fiduciary would do. In that regard, the fact that this fund was significantly overweighted in volatile and illiquid asset classes (specifically EME and private equity) vis-a-vis it's Taft-Hartley peers, nudges plaintiffs' claim across the line from possible to plausible." JA-VII-1890-1891. Judge Caproni also rejected the Teamsters Trustees' notion (argued below) that plan trustees can take "extraordinary measures" like excessive investment gambles in a Hail Mary attempt to avoid looming insolvency. JA-VII-1884-1885 ("I understand the situation the fund was in, but that is extraordinarily risky. I mean, yes, if the risk pays off, *mazel tov*, but the reason that it's risky is that you also have a risk that you're not going to get that return, that you're going to lose money. That's why the investment is risky"). Judge Caproni also

42

rejected the same "prudent process" arguments based on *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013) ("*St. Vincent/PBGC*") raised by the Teamsters Trustees here because plaintiffs in *Snitzer* "alleged specific information that was available to the fund regarding the near term [sic] risk of investing in emerging market equities." JA-VII-1889.

In a footnote, the District Court placed little weight on Judge Caproni's decision in *Snitzer*. The District Court believed, incorrectly, that Judge Caproni's decision contains "minimal factual analysis and cites no legal authority"[15] and reached "a different conclusion" without addressing or distinguishing Judge Caproni's sound analysis. SA-49 footnote 34.

### 2. Plaintiff Pleads a Plausible Claim of Procedural Imprudence

In *Snitzer*, Judge Caproni distinguished and rejected the same procedural prudence arguments and cases cited by the Trustees and adopted by the District Court here. The duty of prudence "requires that the fiduciary act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a

---

[15] The Transcript reflects that Judge Caproni had mastered the record, which included dozens of exhibits, presided over a robust argument with counsel, and read into the record her pre-written decision that she edited in real time. JA-VII-1888. Reflecting the robustness of her decision, after completion of discovery, Judge Caproni also rejected the AFM trustees' request to file a summary judgment motion after reviewing the parties' detailed position statements. JA-VII-1897-1904.

prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *St. Vincent/PBGC*, 712 F.3d at 709, quoting 29 U.S.C. § 1104(a)(1)(B). In *St. Vincent/PBGC*, this Court also held:

> [A] claim for breach of fiduciary duty under ERISA may survive a motion to dismiss—even absent any well-pleaded factual allegations relating to the methods employed by the ERISA fiduciary—if the complaint alleges facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident.

712 F.3d at 718 (cleaned up); *see also Sacerdote v. New York Univ.*, 9 F.4th 95, 108 (2d Cir. 2021) ("*Sacerdote II*") (quoting *St. Vincent/PBGC*) (cleaned up):

> A claim for breach of the duty of prudence will survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed or that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident.

Moreover, the omission of "factual allegations referring directly to [the fiduciary's] knowledge, methods, or investigations at the relevant times . . . is not fatal to a claim" so long as circumstantial factual allegations allow a plausible inference of flawed process. *St. Vincent/PBGC*, 712 F.3d at 718. Courts must analyze the allegations of a complaint as a whole, and not parse the allegations piece-by-piece. *Hughes v. Northwestern Univ*, 595 U.S. 170, 177 (2022); *St. Vincent/PBGC*, 712 F.3d at 732; *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 331 (3d Cir. 2019).

44

Plaintiff's Complaint, analyzed as a whole, easily satisfies those standards. In dismissing Plaintiff's prudence claims, the District Court's analysis, which was riddled with internal inconsistencies, ignored key factual allegations, misconstrued others, drew inferences in favor of Defendants instead of drawing all reasonable inferences in favor of Plaintiff, and generally improperly parsed each allegation piece-by-piece instead of evaluating the Complaint as a whole.

### a. The Trustees engaged in an imprudent process

Given the complexities of any billion-dollar pension fund, one of the most important tasks for plan trustees is to retain qualified advisors to provide independent advice. This is particularly true for Taft-Harley plans, since, by law, half of the plan trustees must be representatives of union labor plan participants (*i.e.*, in this case, primarily teamsters truck drivers) and the other half are designees of the various plan employers. 29 U.S.C. § 186(c)(5)(B). Perhaps the most important advisors are the independent investment advisor, who helps trustees set the plan's investment goals and investment allocations, and the Plan's independent actuary. The Trustees in fact represented to participants that they relied on Meketa and Horizon in the investment process to take "the necessary steps to ensure there will be sufficient assets to pay pensions." JA-I-48-49 (¶¶39,40).

The Trustees failed in this task by (1) retaining Meketa in a dual, conflicted role with a financial incentive to, in its role as independent investment advisor,

distort its asset allocation advice to promote excessive bets on private markets investments; (2) keeping Meketa in that dual role for over a decade as the excessive EME and private equity bets failed and drove the Plan toward insolvency; (3) either failing to discover or ignoring that the DOL sued the IAM fund trustees for retaining Meketa in the same dual conflicted role, and AFM plan counsel criticized Meketa for making the same unseemly pitch to the AFM trustees; and (4) by retaining and relying upon Horizon as the Plan's independent actuary even though Horizon (in response to pressure from the Trustees and Meketa) abandoned its independence and professional standards (including ASOP 27) by literally having two sets of books to be actively complicit in the high-risk investment decisions by inflating its actuarial return assumption to enable the Trustees' and Meketa's ability to make and persist in their imprudent asset allocation bets.

Thus, the Trustees' entire investment process and strategy was tainted by their decision to retain and rely upon compromised advisors. *See*, *e.g. Perez v. First Bankers Trust Servs.,* 210 F. Supp.3d 518, 529-530 (S.D.N.Y. 2016) ("an expert's 'independence' is an independent pre-requisite to relying on the expert's advice."). The Trustees compounded their process mistake of hiring and retaining conflicted advisors by then (1) failing to learn or ignoring that at the same time Meketa recommended they should continue excessive allocations to EMEs and private equity, Meketa did the exact opposite with respect to its own discretionary funds and

46

for clients like AFM for which it did not serve in a dual, conflicted role, (2) failing to learn or ignoring that Horzion's inflated 8.5% long-term actuarial investment return assumption was inappropriate given the Plan's dangerous underfunded condition and need for liquidity and unprecedented compared to their Taft-Hartley peer plans; and (3) persisting in their excessive asset allocation bet after telling Treasury that the Plan would de-risk its asset allocation in order to get approval for MPRA benefit cuts.

What's more, by lacking candor to Plan participants and regulators to hide the real-world gap between the ASOP-27 compliant actuarial return assumption and the actual target investment return and the Plan's true funded status and likelihood of insolvency, the Trustees lost the benefit of having regulators and Plan participants serve as a crosscheck on their excessive gambles. And when the Treasury Department took the Trustees and Horizon to task for the gap between the 6.75%-7.5% ASOP-27 compliant actuarial return assumption and 8.5% target investment return, the Trustees, in cahoots with Horizon, simply lied and told Treasury that going forward, the Trustees would reduce the target investment return to match the lower ASOP-27 compliant actuarial return assumption after the cuts.

A process infected by conflicts, lies, lack of independence, knowing disregard of professional standards, and two sets of books is the epitome of a process infected with imprudence, tainting every decision made in that process. Thus, the District

47

Court's view that the Complaint failed to provide sufficient detail to state a procedural imprudence claim is wrong. *See St. Vincent/PBGC*, 712 F.3d at 718 (omission of "factual allegations referring directly to [the fiduciary's] knowledge, methods, or investigations at the relevant times . . . is not fatal to a claim" so long as circumstantial factual allegations allow a plausible inference of flawed process).

In addition to the Trustees' liability for this flawed process, because Meketa was admittedly a Plan fiduciary, and Horizon functioned as a Plan fiduciary for the reasons set forth in Section B below, and both took many affirmative steps that tainted the investment-allocation process, and were otherwise complicit with the Trustees' process deficiencies, the Complaint also states plausible procedural imprudence claims against both.

> **b.    The District Court erred in holding that the Trustees' and Meketa's outlier 8.5% target investment return and 50% allocation to the highest-risk asset classes do not plausibly state a duty of prudence claim**

In dismissing Plaintiff's claims regrading Defendants' 8.5% target investment return and allocation of over 50% of the Plan's assets to the highest risk asset classes, and the resulting paltry 18% allocation to domestic equities, which extremely departed from the investment portfolio of any other Taft-Hartley plan (even the AFM plan), the District Court distorted and/or ignored the key allegations of the Complaint, failed to accord reasonable inferences to Plaintiff, and failed to read all the allegations of the Complaint as a whole.

48

For example, the District Court referenced Plaintiff's allegations that:

> … in May 2014, Meketa advised that compared to its "U.S. Peer Group" of "U.S. Taft-Hartley Peers," the Plan had a 16% equity allocation to EME and 15% equity allocation to PE, while its "Peers" had 2% equity allocation to EME and 4% equity allocation to PE. (*Id.* ¶ 67).

SA-53 (quotations in original). Yet the District Court gave no weight to those allegations because, in its view:

> The Complaint provides no additional facts regarding the Plan's "Peers," such as the size or financial condition of the other plans, the number of plans represented, or the risks levels of the "peer" plans' other investments. Without more, these facts allow only the inference of the "mere possibility of misconduct."

JA-I-53-54, quoting *St. Vincent/PBGC*, 712 F.3d at 718. Not so. The District Court's analysis completely ignores the detailed factual allegations about how Meketa told the Trustees that the relevant benchmark for both the Teamsters and similarly-sized AFM plan for comparison purposes was the Plan's Taft-Hartley peers (JA-I-58-59, 63 at ¶¶67, 75), as did Horizon, JA-I-53 (¶54.a). Indeed, since the Trustees hired and relied upon Meketa, and Meketa told the Teamsters Trustees (and AFM trustees) that the data in the comparison chart was the relevant peer group for comparison purposes, the notion that Plaintiff failed to plausibly allege the proper peer group for comparison purposes is both factually nonsensical and legally wrong.[16]

---

[16] In ERISA excessive fee cases, courts have reversed district courts that dismissed ERISA claims even where, unlike here, *plaintiff's counsel* cherry picked the benchmark plans for comparison purposes. *See, e.g., Mator v. Wesco Dist., Inc.*, 102

In addition, besides the Plan's Taft-Hartley peers as reported by Meketa, the Complaint has detailed allegations from authoritative sources that range from Milliman, Horizon, Deloitte, Willis Towers Watson, Meketa, Wilshire Trust Universe Comparison Service (which broke down asset allocations from 2013-2016 by large and small Taft-Hartley plans),[17] Aon Hewitt, the National Association of State Retirement Administrators, about plan actuarial and investment return assumptions and Taft-Hartley and other large pension plan asset allocations. *See* JA-I-34 (¶¶112-113, 51, 54, 56, 62, 100). The Complaint robustly demonstrates that Defendants' target investment return and asset allocation was far outside the box compared not only to the best peer comp group (Taft-Hartley plans) but also compared to every other large pension plan.

The District Court next discounted the probative value of the Complaint's detailed factual allegations based on timing concerns, but those concerns are

---

F.4th 172, 181, 185 (3d Cir. 2024) ("District Court's criticisms do not scuttle the comparisons or the complaint"); *Kohari v. MetLife Grp., Inc.*, 2022 U.S. Dist. LEXIS 136505, at *23 (S.D.N.Y., 2022); *Cunningham v. Cornell Univ.,* 2017 U.S. Dist. LEXIS 162420, at *20 (S.D.N.Y., 2017), *aff'd* 86 F.4th 961 (2d. Cir. 2023), *rev'd on other grounds*, 145 S. Ct. 1020 (2025) ("defendants' argument that plaintiffs used inappropriate benchmarks to assess the performance of the challenged options raises factual questions that are not properly addressed on a motion to dismiss").

[17] Even though Wilshire is a prominent global financial services firm with expertise in providing peer comparisons (*see* https://www.wilshire.com/about-us/history and https://www.wilshire.com/solutions/analytics/peer-analysis), the District Court discounted these allegations due to its apparent lack of familiarity with Wilshire and its data analysis chart reflecting Taft-Harty plan asset allocations from 2013-2016.

factually wrong, construe inferences against the Plaintiff, and conflict with Supreme Court precedent. For example, the District Court said that Horzion's Surveys of Capital Market Assumptions (¶¶51, 54.a) "post date the class period and thus do not allow a plausible inference that Defendants' use of an 8.5% return target in, for example, 2014, at the start of the class period, was imprudent as neither the Trustees nor Meketa would have had access to such information at the time." SA-53. This conclusion is wrong for several reasons.

First, the class period runs from October 2014 (due to ERISA's six-year statute of limitations) through the present, so Defendants had actual knowledge of Horizon's 2015 survey with respect to decisions made from 2015 through the filing of the Complaint in October 2020 and beyond.[18] Second, the Complaint (JA-I-51-52 at ¶51) specifically refers to Horizon's 2015 Survey just an "example," and Horizon does the Surveys annually (JA-I-53 at ¶54.a about Horizon's Surveys "during the class Period" generally and from 2014 to 2019 specifically), so Horizon knew about peer Taft-Hartley allocations in 2014.[19] Third, before the start of the class period, *in*

---

[18] The District Court's analysis conflicts with *Tibble v. Edison International*, 575 U.S. 523, 529-30 (2015), where the Supreme Court held that ERISA fiduciaries have a continuing duty to monitor and re-evaluate each of their decisions, even if the initial decision, including investment decisions, occurred outside the statute of limitations.

[19] Regardless, the Court erred in making the illogical leap that Defendants did not know the Taft-Hartley allocation data in 2014, and even if they did not, Plaintiff was entitled to the reasonable inference that Defendants should have known had they

*January 2014*, Meketa warned the Trustees about EME risks and how plans reduced their EME allocations from 2013, and in May 2014 provided the Trustees with its peer comparison chart with the warning that "Relative to the peer universe, the Fund is significantly underweight domestic and international developed market equities, and is significantly overweight to emerging markets." JA-I-58-59 (¶¶65-67); *see also* JA-I-56 at ¶59 (Meketa delivered the same warning in March 2014).[20] Fourth, the Complaint cites the Wilshire asset allocation Survey from 2013-2016 and warnings about EMEs from the IMF in September 2014. JA-I-59-60 (¶69).

Besides its flawed factual analysis, the District Court's citations to *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167 (6th Cir. 2022), *Barchock v. CVS Health Corp.*, 886 F.3d 43, 52 (1st Cir. 2018) and *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018), are inapposite. Each of those cases involved *defined-contribution* 401(k) plans *where plan participants could choose which investments to make* based on the disclosure prospectuses of each of the many funds made

---

exercised reasonable care in prudently informing themselves in carrying out their fiduciary duties.

[20] Again construing inferences against Plaintiff, the District Court, based on similar timing grounds, improperly discounted the allegations that Meketa knew as the investment consultant to … [the AMF plan]), that the AFM-EPF's actuary, Milliman, refused the trustees' request to increase the 7.5% actuarial return assumption based on the plan's high risk asset allocation" SA-53 footnote 23, quoting JA-I-54-55 at ¶¶56-57. Meketa warned the AFM trustees in early 2014 regarding the uncertainty and volatility in EME investments in the global economy. JA-I-64 (¶80).

52

available in those 401(k) plans and based on the asset allocation of their entire personal investment portfolio.[21] So the relevant benchmark analyses in those cases have no relevance to the benchmarks relevant to the *defined benefit* Plan here.

Moreover, in each of those cases, the complaints contained little if any basis to show that the proffered benchmarks were relevant. For example, in *Mator*, 102 F.4th at 188, the Third Circuit distinguished *Smith* because plaintiff's only comparators were averages from an industry publication which "fail[ed] to give the kind of context that could move [the] claim from possibility to plausibility," and because plaintiff did "not plead[] that the services that CommonSpirit's fee covers are equivalent to those provided by the plans comprising the average in the industry publication that she cites." *Smith*, 37 F.4th at 1169; *accord Perkins v. United Surgical Partners Int'l, Inc.*, 2024 U.S. App. LEXIS 8804, at *12 (5th Cir. 2024); *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 217 (6th Cir. 2024) and *Hughes v. Northwestern Univ.*, 63 F.4th 615, 632 (7th Cir. 2023) (each similarly distinguishing *Smith*). Those distinctions apply with even greater force here.

*Barchock*, where the plaintiff also solely relied on generic industry averages, is even more far afield. There one option in a defined contribution 401(k) plan was

---

[21] *See.,e.g., Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan,* 960 F.3d 190, 198 (5th Cir. 2020) ("ERISA does not require fiduciaries of a defined contribution plan to act as personal investment advisers to plan participants. Such a plan gives participants the control by design, and it gives employees the responsibility and freedom to choose how to invest their funds.") (cleaned up).

a stable value fund with the "stated objective of preserving capital while outperforming money market funds." 886 F.3d at 49-50. The plaintiff, who chose to invest in that fund, alleged that the fund's cash-equivalent allocations were *too conservative* because a relatively high proportion of the fund's assets were allocated to short-term, cash-equivalent investments. *Id*. This Court held simply held that "conservativism in the management of a stable value fund -- *when consistent with the fund's objectives disclosed to the plan participants* -- is no vice." *Id*. (emphasis added). The Court also explained why the industry survey was too ambiguous to show that the fund "departed radically" or was a "severe outlier" from other stable value funds – each of which had their own unique objectives and disclosures. *Id*. at 52-53.

The defined contribution 401(k) plan in *Meiners* allowed participants to choose between more than two dozen investment options, including some Wells Fargo target date funds that plaintiff alleged had higher fees than allegedly comparable Vanguard and Fidelity funds, and worse performance than the Vanguard fund (but not the Fidelity fund). 898 F.3d at 821, 822. The court simply held that "the fact that one fund *with a different investment strategy* ultimately performed better does not establish anything about whether the Wells Fargo TDFs were an imprudent choice at the outset." *Id*. at 823 (emphasis added). The court also determined that the Vanguard and Fidelity funds were not meaningful benchmarks

based on the objectives and disclosures made in the various funds' prospectuses. *Id*. And the court held that the existence of a cheaper fund did not mean that a particular fund was too expensive or an imprudent choice. *Id*. at 821-822.[22]

> **c.** **The District Court erred in holding Plaintiff failed to plausibly allege that the Trustees' and Meketa's Asset Allocation created an imprudent degree of risk, volatility and illiquidity**

With respect to Plaintiff's claim that the Plan's out-of-the-box investment allocation of concentrating over 50% of Plan assets to the highest-risk asset classes represented an unprecedented, imprudent gamble, the District Court first acknowledged the allegations at paragraphs 57-58 of the Complaint that:

> Meketa advised the Trustees that EME investments had "risks of high volatility, "significant short-term relative performance risk," "high cost," "more expensive higher management fees, trading cost, custody costs, etc." [and that] Meketa advised that PE investments carried "the risks of 'illiquidity,' as well as 'higher management fees" and "lack of transparency."

SA-55 (cleaned up). In the next sentence of its decision, the District Court then discounted those critical allegations based on another inaccurate timing analysis, stating: "The Complaint does not allege when Meketa provided this advice." JA-I-55. But beginning in the very next sentence, the District Court incongruently lists a

---

[22] For the reasons discussed more fully in Section A(2)(c) below, *St. Vincent/PBGC* is irrelevant because the allegations in the complaint there only made a "conclusory assertion" about the alleged benchmark "unsupported by any factual allegation." 712 F.3d at 726.

litany of warnings that Meketa provided the Trustees about the risks associated with EME and PE that Meketa provided *beginning in 2014*. JA-I-55-56, citing Complaint ¶¶59, 65-67, 71-72.

The District Court also ignored a series of warnings about the risks associated with EME and PE from Meketa in *every* quarterly report beginning *in March 2014* (JA-I-67-68 at ¶87); from Meketa again in January 2015 (JA-I-60 ¶70); and from the IMF in October 2014 JA-I-59-60 at (¶¶68-69); including allegations about Meketa's divestiture of EME from its own portfolios in early 2016 due to excessive risks (JA-I-63 at ¶75); Meketa's reports for Plan years beginning in 2014 that the Plan's EME investments generally substantially lagged the S&P 500, the DJIA, and the Vanguard Balanced Index Fund from (JA-I-64-65 at ¶81); and Aon Hewitt's Target Asset Allocation for large pension plans that it prepared for the New York State Teacher's Retirement Fund in 2015. JA-I-76 (¶100).[23]

Thus, the District Court's timing analysis is not only internally inconsistent and belied by the allegations of the Complaint, but also contrary to the controlling Rule 12 standards. If the Trustees did not know about the extreme risk, volatility and illiquidity of EME and PE in the early part of the class period, the only reasonable

---

[23] The District Court makes another timing analysis mistake by suggesting that Defendants had a limited duty to investigate the propriety of its outlier asset allocation in 2014 because it implemented that strategy before 2014. SA-56. That analysis conflicts with the Supreme Court's decision in *Tibble*.

inference (and certainly a plausible inference) is that that the Trustees imprudently failed to properly educate themselves with readily available information, and Meketa, in its fiduciary role as private markets manager, imprudently failed to properly warn the Trustees, before making an unprecedented gamble with the Plan's investment portfolio.[24]

Besides ignoring the aforementioned relevant factual allegations, the District Court's notion that "none of these generalized allegations regarding EME risk factors allow a plausible inference that the specific EME funds in which the Plan invested, Aberdeen, Dimensional, Vontobel, SSgA, or GQG,27 were imprudent" (SA-57, citing *St. Vincent/PBGC*), is misplaced. Besides the fact that the warnings were not merely generalized (particularly since based on those warnings Meketa de-risked its portfolio and advised the AFM trustees to do the same), the District Court's focus on the specific EME and PE investments misses the point. Plaintiff's claim is not that the Trustees acted imprudently by making *any* investment allocation to EME/PE or that they acted imprudently merely by choosing *any specific* EME/PE investment. Rather, the claim is that the EME/PE assets classes as a whole were the highest-risk asset classes and that the excessive, unprecedented allocation of over 50% of Plan assets was an imprudent gamble to make and then continue regardless

---

[24] The Plan had experienced massive EME volatility prior to the Class Period. *See* JA-I-58-59.

of the specific underlying EME/PE investments they chose, as was the accompanying decrease in the Plan's domestic equities allocation far below that of the Plan's Taft-Hartley peers.

The District Court compounded its errors by inexplicably stating at page 58 of its Decision (SA-58) that "none of Meketa's reports contained any warnings about investments in PE, natural resources, or infrastructure" despite having previously said at page 9 (SA-9) that "the Trustees had been advised that emerging markets equity ("EME") and private equity ("PE") investments were risky, volatile, carried greater fees, and posed a danger of illiquidity…." Indeed, the Complaint is replete with refences to those stark warnings from Meketa, which are universally-accepted facts. *See* Section E of the Statement of the Case) above, citing paragraphs 12, 31, 55, 59-60, 66-67 85-86, and 95-107 of the Complaint.

The District Court also failed to properly apply this Court's decision in *St. Vincent/PBGC* to the facts of this case. In *St. Vincent/PBGC*, the plan trustees hired defendant Morgan Stanly to manage 35% of overall plan assets in a fixed income securities portfolio. 712. F.3d at 710. The plaintiff challenged Morgan Stanley's investment of between 9% to 12% of that portfolio (representing only 3.15% to 4.2% of the plan's overall investment assets) in risky non-agency mortgage securities, thereby exposing the Plan to excessive risk compared to the Citigroup Broad Investment Grade Bond Index ("BIG"). *Id*. at 711-712. Unlike here, the complaint

contained "no factual allegations referring *directly* to Morgan Stanley's knowledge, methods, or investigations at the relevant times." *Id*. at 718. Unlike here, the complaint also failed to allege why Morgan Stanley should have sold off its non-agency mortgage securities holdings because it failed to "allege *any* such surrounding circumstances that might make this inference plausible, and fails to connect the alleged warning signs to any specific characteristics of the securities in the Portfolio." *Id*. at 712-722 (emphasis in original). Nor did the complaint allege that when Standard & Poor's downgraded the credit ratings of certain Alt-A mortgages that it "downgraded any of the [specific] securities held in the Portfolio." *Id*. at 723.

The detailed allegations here stand in stark contrast to the sparse allegations in *St. Vincent/PBGC*, where there were no allegations that Morgan Stanley had a dual conflicted role, or kept two sets of books, or that, like Meketa, Morgan Stanley advised the trustees that the entire asset classes were the highest-risk asset classes. Most important is that here there are specific allegations that over 50% of Plan assets were invested in the highest-risk asset classes (compared to less than 4.2% in *St. Vincent/PBGC*) and that such a skewed allocation was way out of line with the relevant benchmark – the Plan's Taft-Hartley peers.[25]

---

[25] This Court emphasized the importance of this skewed allocation of overall plan assets in *St. Vincent/PBGC*. There, the Court noted that complaint alleged an unspecified 10% variance regarding "the concentration of mortgage-backed

59

Thus, unlike in *St. Vincent/PBGC*, where the complaint failed to allege "*any* such surrounding circumstances that might make this inference [of imprudence] plausible, and fail[ed] to connect the alleged 'warning signs' to any specific characteristics of the securities in the Portfolio" (712. F.3d at 722), the Complaint here is replete with detailed allegations. For similar reasons, Judge Caproni distinguished *St. Vincent/PBGC* in *Snitzer*. JA-VII-1889.

The District Court's citation to *Anderson v. Intel Corp.*, 2021 U.S. Dist. LEXIS 12496, at *40 (N.D. Cal. 2021) is also misplaced. First, *Anderson* is inapposite because related to a defined contribution pension plan. 2021 U.S. Dist. LEXIS 12496, at *6-7. The court carefully distinguished situations where, like here, plaintiff stated a cognizable claim under ERISA § 404(a)(1)(C)'s diversification requirement. *Id*. at *24-25, citing *Stegemann v. Gannett Co.*, 970 F.3d 465, 470 (4th Cir. 2020) (finding that plaintiff stated a cognizable claim for breach of the duty of prudence based on allegations of concentration of plan assets in problematic single-

---

securities in the benchmark index, and without any facts suggesting whether and how this 10% variance from the [BIG] Index is material to the Fund's diversification" because the unspecified variance "could be the difference between 10% and 20%, or it could be the difference between 90% and 100%." *Id*. at 724-725. Here the relative variance was over 500% (*see* JA-I-58-59 at ¶67, reflecting 31% invested in EME/PE compared to 6% by peers) and the overall 50% Plan allocation to highest-risk asset classes was almost 12 times greater than the 4.2% in *St. Vincent/PBGC*.

stock fund);[26] *St. Vincent/PBGC*, 712 F.3d at 724 (holding that although failure to diversify may give rise to a claim for breach of fiduciary duty, plaintiff failed to state a claim on the facts alleged); and *Olsen v. Hegarty*, 180 F. Supp. 2d 552, 567 (D.N.J. 2001) (plaintiff stated a claim for breach of fiduciary duty for failure to diversify by alleging concentration of investment in one asset).

Second, in *Anderson*, plaintiff relied "heavily" on just a single report from 2011 that hedge funds and private equity were risky, and the court held "that small body of evidence is insufficient *on its own* to support a claim for breach of the duty of prudence." 2021 U.S. Dist. LEXIS 12496, at *39-40 (emphasis added). The Complaint here alleges a much more robust body of evidence, not just quantitatively but also qualitatively, including evidence from Defendants.

Third, unlike Meketa's conflict of interest here, which resulted in Meketa receiving almost a five-fold increase in its annual fees, Anderson's complaint was "devoid of even minimal factual support" of any "real conflict of interest" or "self-dealing." *Id*. at *42-43.

---

[26] In S*tegemann*, 970 F.3d at 475 (cleaned up), the Fourth Circuit, *quoting Summers v. State St. Bank & Tr. Co*., 453 F.3d 404, 409 (7th Cir. 2006), noted: "In a diversified portfolio, that is, one which contains a variety of investments, the risks of the various components of such a portfolio tend to cancel out; that is the meaning and objective of diversification." By concentrating over 50% of Plan assets in the highest-risk asset classes, Defendants here flunked the fundamental investing principle of diversification. *See Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 732 (7th Cir. 2006) ("The duty to diversify is an essential element of the ordinary trustee's duty of prudence . . . .").

Finally, the complaint in *Anderson* "failed to provide sufficient allegations to support their claim" that other funds like the S&P 500, the DJIA, and the Vanguard Balanced Fund and LifeStrategy Moderate Growth Fund, were an "adequate benchmark against which to compare the performance of the Intel Funds. *Id.* at *29-30. Here, the Plan not only ignominiously performed far worse than the S&P 500, the DJIA, and the Vanguard Balanced Index Fund, but more importantly, specifically due to the Trustees' outlier asset allocation, performed far worse than its Taft-Hartley peers, which Meketa and Horizon opined was the appropriate benchmark.

> **d.  The District Court's flawed relative performance analysis ignored critical facts alleged in the Complaint**

The District Court correctly noted the holding in *St. Vincent/PBGC*, 712 F.3d at 721, that: "In some cases, it would be reasonable to infer from a decline in the price of a security, combined with other alleged facts, that the security no longer was a sound investment." SA-58. The Complaint here made detailed allegations of both staggering EME losses and "other" facts reflecting imprudence, but the District Court ignored or refused to credit those allegations.

Defendants made an outsized bet by allocating over 15% of Plan assets to EME when peer Taft-Hartley funds allocated only 2% - 4.5% despite stern warnings from Meketa and others such as the IMF that EME was "the highest risk asset class in terms of volatility" and that "the EME asset class "was a mortal enemy to the Plan

in its dangerous condition, as near term losses lower the base for subsequent compounding even if high returns occur in later years." JA-I-57-61, 63 (¶¶64-69, 71-72, 75). Not surprisingly, the mortal enemy of volatility ensued, the Trustees nonetheless pressed on, and the Trustees lost their EME bet, losing an astounding $31 million from 2014-2020 and hundreds of millions of dollars in lost investment returns in the midst of a raging domestic equity bull run and continuing the Plan toward insolvency. JA-I-58-59, 64-65 (¶¶66-67, 79, 81).

Faced with these allegations, the District Court noted that "Plaintiff alleges that from 2014 to 2020, the Plan's EME investments 'generally substantially lagged the S&P 500, the DJIA, and the Vanguard Balanced Index Fund'" but questioned whether those indices "are appropriate benchmarks or comparators." SA-58. The combination of those gold-standard indices are certainly appropriate benchmarks, because Plaintiff's claim is not that Defendants should have invested over 15% of Plan assets a different mix of EME investments, but that the overall allocation to the highest risk asset classes, with the 15% EME bet along with their outsized bets in PE and Alternatives, was far too large and came at the expense of the Plan's domestic equity investment, which was only 18% compared to the Tafte-Hartley peer average of 32%. JA-I-58-59 (¶67). Had the Trustees put the Plan's EME investments from 2014 to 2020 into these benchmark funds, the Plan would have *earned* between $132.9 million-$182 million instead of *losing* $31 million. JA-I-65 (¶82).

63

Regardless, as Meketa opined, the Plan's Taft-Hartley peers were the appropriate benchmark, and the Plan's returns continuously lagged those of its peers precisely due to its outlier asset allocation. JA-I-58-59 (¶67).

Given this large disparity, the District Court's citation to *Patterson v. Stanley*, 2019 U.S. Dist. LEXIS 174832, at *10 (S.D.N.Y. 2019), is inapposite for three reasons. First, *Patterson* related to a defined contribution 401(k) plan. Second, in *Patterson*, the disparity in returns between the Morgan Stanley MidCap Fund and the Russell Midcap Growth Index was "less than one percentage point," and the court held that "such a small disparity in performance relative to its benchmark does not support the inference that Defendants were imprudent to retain the Mid Cap Fund in the set of Plan offerings." *Id*. at *32. The comparable losses here are not only far more substantial than those in *Patterson*, but also more than the 9% disparity in another case *Patterson* cited as an example of a claim that passes Rule 12 muster. *Id*. at *31-32, citing *Jacobs v. Verizon Commc'ns, Inc.*, 2017 U.S. Dist. LEXIS 162703, at *25-26 (S.D.N.Y. 2017). Third, unlike in *Patterson*, the Complaint here does not "lack[]any detail as to the extent of the investment's shortcomings or why the [benchmark] Fund is a comparable investment." SA-59, citing *Patterson*, 2019 U.S. Dist. LEXIS 174832, at *36. Rather, the Complaint here provides specific warnings, specific yearly numbers, and reasons why the Plan's Taft-Hartley peers

64

and domestic equity indices like the S&P 500, DJIA, and VBIF are appropriate benchmarks. *Id.*[27]

The District Court next miscited *Patterson's* citation to *Sacerdote v. New York Univ.* ("*Sacerdote I*"), 2017 U.S. Dist. LEXIS 137115, at *30 (S.D.N.Y. 2017), vacated on other grounds, 9 F.4th 95 (2d Cir. 2021) ("*Sacerdote II*"), for the proposition that only allegations of consistent, ten-year underperformance may support a duty of prudence claim. SA-59-60. *Sacerdote I* only held that a "ten-year record of consistent underperformance …combined with an allegation of inaction, plausibly supports a claim." *Id.* at *30. *Sacerdote I* and *Patterson* did not set any ten-year bright-line minimum for stating a claim. Nor would that make any sense given ERISA's six-year statute of limitations. *Sacerdote I* also emphasized that arguments regarding the propriety of benchmarks or time periods "raises factual questions that are not appropriately addressed at [the pleadings stage]." *Id.*

In any event, the allegations here meet even a 10-year standard. Perhaps because Defendants did not make the 10-year bright-line argument below, the District Court mistakenly assumed the reason why the various charts and allegations in the 2020 Complaint focused on a start date of 2014, which led it to the false conclusion that Defendants' EME investment gamble and related losses started in

---

[27] The District Court's citation to *Anderson v. Intel* is distinguishable for the same reasons and those discussed above about that case above.

2014. The focus on 2014 was because of ERISA's six-year statute of limitations. As alluded to in the Complaint, the Complaint supports a reasonable inference that the high risk asset gamble began no later than 2011. The Defendants received warnings about EME, made significant EME and PE investments, and suffered significant EME losses, so there is a 10-year track record. JA-I-50 at ¶47 ("Internal Plan documents show during the Class Period, the Trustees and their advisors imprudently deployed and maintained a high-risk, high-cost asset allocation with an extraordinary percentage of the Plan's assets in the highest risk and costliest asset classes, to chase a grossly excessive and unreasonable 8.5% "actuarial return target,"); *id.* (reflecting Meketa's increased compensation for managing the high-risk private markets portfolio began in 2011); JA-I-47 at ¶35 (Horizon used the inflated 8.5% "to chase the high risk assets" in the 2009 FIP); JA-I-54, 56, 58-59 at ¶¶55, 59, 65-67 (By 2013, the Plan had the outlier high risk asset allocation and was underperforming its peers); JA-I-58-60 (the Plan experienced high EME volatility prior to the Class Period); JA-VII-1762 (AFM Amended Complaint) at ¶¶65-67, 74-76, 79, 81-82 (reflecting EME warnings from Meketa and losses from 2010-2014).

### e. The District Court's Analysis Regarding Excessive Fees is Flawed

The District Court misunderstood the import of Plaintiff's excessive fee allegations. As a result, it mis-analyzed the allegations regarding PE/EME fees as if the claim were that the fees associated with the Plan's specific PE/EME investments

were too high relative to fees to alternative PE/EME investments. *See* SA-60-61, citing cases (*Bekker v. Neuberger Berman Grp. LLC*, 2018 U.S. Dist. LEXIS 166690, at \*17 (S.D.N.Y. 2018) and *Anderson*, 2021 U.S. Dist. LEXIS 12496, at \*34) comparing fees of actual plan funds to alleged benchmark funds in the same asset class. Unlike those cases, the claim here is not that the Defendants should have chosen one PE/EME investment over another based on which one had cheaper fees, but that the excessive allocation to PE/EME was imprudent because PE/EME were in the highest-risk asset classes in part due to the excessive fees associated with PE/EME investment as an asset class.

In addition, the District Court ignored that as a result of hiring Meketa in the dual, conflicted role, and thereby making an outsized PE bet, the Plan paid Meketa and Fiduciary Counselors millions of dollars in unnecessary fees from 2011-2020 so Meketa could serve as private markets manager. JA-I-38, 45 (¶¶10, 29). The Plan also paid almost $10 million in manager fees for its dedicated EME investments. JA-I-64 (¶80). These high, unnecessary fees represented a lag on the Plan's investment returns.

The rest of the District Court's analysis of Plaintiff's claims regarding the high fees associated with Defendants' EME and PE gambles is off point. Because PE has unique risks such as illiquidity, lack of transparency, and high management fees compared to public investments such as domestic equities, to make any sense on a

67

risk-reward basis, it is recognized that PE requires a 3% premium above the S&P 500 or a 4% premium above the Russell 3000 to justify the increased risk. JA-I-74 (¶95). But study after study reflects that actual PE returns do not justify the enhanced risks. JA-I-74-79 (¶¶96-99, 103-107). And in fact, the Plan's returns on Defendants' outsized PE bet lagged the Plan's returns on its domestic equity investments while the disastrous EME bet resulted in an absolute $31 million loss. Taken together, these facts explain why Meketa advised the Trustees that PE was in the highest-risk asset category and why the Plan's Taft-Hartley peers limit their PE investments to about 4% of their total equity investments, or about one-fourth of Defendants' outsized PE bet. JA-I-58-59 (¶67).

Due to its flawed analysis, the District Court's holding that Complaint's allegations regarding the high costs of EME and private-market investments are "conclusory and fail to raise a plausible inference of imprudence" (SA-61) is simply wrong.

### f.    The Complaint states an imprudence claim due to Defendants' failure to diversify

ERISA requires a plan fiduciary to "diversify[ ] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." *St.Vincent/PBGC*, 712 F.3d at 724 (quoting 29 U.S.C. § 1104(a)(1)(C)). "The duty to diversify is not measured by hard and fast rules or formulas." *Id.* at 717. "Instead, 'a prudent fiduciary must consider the facts and

68

circumstances of each case.'" *Id.* Factors to be considered "[i]n deciding whether the diversification requirement was breached" "include (1) the purposes of the plan; (2) the amount of plan assets; (3) financial and industrial conditions; (4) the type of investment . . . ; (5) distribution as to geographic[al] location; (6) distribution as to industries; [and] (7) the dates of maturity." *Id.*

Defendants breached the duty to diversify by recklessly investing and maintaining over 50% of Plan assets in the highest-risk and most volatile asset classes far beyond its Taft-Hartley peers. This high-risk allocation in the most volatile asset classes was particularly imprudent since they knew that given the Plan's dangerously underfunded condition, any near-term losses would lower the base for subsequent compounding even if high returns occur in later years, particularly since the Plan required significant cash outflows to pay benefits. JA-I-34 (¶¶10, 31, 57, 64, 83, 136).

Despite these detailed allegations, at pages 63-64 of its Decision, the District Court inaccurately stated that: "The Complaint lacks allegations regarding:

- "the amount of plan assets during the relevant time period" despite noting at page 4 that paragraphs 24-25 of the Complaint alleged that "the Plan held $1.467 billion in total assets" (SA-4);

- "the types of investments Defendants made" despite the detailed allegations about the amounts invested, on a dollar and percentage of

assets basis, associated fees, performance, and information about specific investments, with respect to invested in EME, PE, and Alternatives (JA-I-34 at ¶¶60-61, 63-67, 70-71, 76-93);

- "dates of maturity" even though the Complaint is replete with allegations about the illiquidity of PE (JA-I-34 at ¶¶31, 57-58, 83-84, 99, 101-102, 107-108); and

- "contains no facts concerning the investment of the remaining 50% to 70% of Plan assets" even though, as cited above, the Complaint reflects exactly how the rest of the Plan's assets (particularity domestic equities) were invested, also on a dollar and percentage of assets basis. JA-I-34 (¶¶59, 67, 75, 94).

Moreover, details of all the Plan's investments are contained in the various reports submitted as part of the record. JA-III-633, JA-458, JA-1219.

Accordingly, the District Court's assertion that there was a "paucity of factual allegations regarding the Plan's non-EME and PE investments [that] prohibit a plausible inference of lack of diversification" (SA-64) is mystifying. More fundamentally, the District Court's analysis improperly weighs evidence and fails to make reasonable inferences in favor of Plaintiff in violation of Rule 12 standards.

### g. Defendants' asset allocation violated the Plan's Investment Policy Statement

Defendants violated ERISA § 1104(a)(1)(D), which requires fiduciaries to act in accordance with plan documents, because their asset allocation failed to comply with the Plan's Investment Policy Statement ("IPS").

The IPS placed reasonable restrictions "to ensure the prudent investment of funds in such a manner as to provide real growth of assets over time while protecting the value of the assets from undue volatility or risk of loss" with market risk limited in manner consistent with moderate interim volatility without sacrificing the potential for long-term real growth of assets" by using "extensive diversification to minimize exposure …in the aggregate investment portfolio" and "avoid extreme levels of volatility…" JA-I-50-51 (¶48).

Defendants' bet-the-house asset allocation violated all of these restrictions. Nonetheless, the District Court summarily dismissed Plaintiff's claim for violation of the IPS by first stating that "the Complaint fails to identify any provision of a Plan document that Defendants have violated, but instead generally cites the statutory provision" even though the Complaint quotes the exact provisions of the IPS that Defendants violated. The District Court then inconsistently cited the IPS provisions that Plan investments should "avoid extreme levels of volatility that could adversely affect the Plan's participants" (SA-64, quoting Complaint ¶48) but ignored the Complaint's detailed allegations that Defendants' allocated an unprecedented 50%

71

of Plan assets to the most volatile asset classes because, in its view, "the Complaint does not adequately allege facts regarding volatility, much less allowing an inference that the asset allocations at issue exposed the Plan to 'extreme levels of volatility.'" *Id*.

That analysis is flawed and should be reversed.

### h. The Allegations of the Complaint as a whole plausibly allege that Defendants acted imprudently

The District Court's analysis at pages 49-62 of its Decision parses the allegations of the Complaint piece-by-piece instead of analyzing the allegations of a complaint as a whole as required by the Supreme Court in *Hughes* and this Court in *St. Vincent/PBGC*. The District Court compounded that mistake in a one-paragraph section entitled "Collective Allegations," which does nothing more than state, in conclusory fashion, contrary to all of the detailed allegations discussed above, that "the Complaint lacked factual allegations that would allow a plausible inference that that the investments at issue were so plainly risky at the relevant times that an adequate investigation would have revealed their imprudence, or that a superior alternative investment was readily apparent such that an adequate investigation would have uncovered that alternative." SA-62 (cleaned up). Meketa and numerous other authoritative entities told the Trustees that the EME, PE and Alternatives were the highest-risk asset classes, that the 50% allocation to those high-risk asset classes along with the accompanying underweight allocation to domestic equities was an

extreme outlier compared to the relevant Taft-Hartley peer plans, that their outlier asset allocation was the reason why the Plan's investment performance lagged its peer group, and that a more reasonable allocation to domestic equities would have generated far more in returns with far less risk and illiquidity. Those detailed allegations were buttressed with detailed allegations about the defective process used by the Trustees that was riddled with inherent conflicts and fake numbers by Horizon in order support Defendants' gambling spree and hide that spree from regulators and Plan participants.

Moreover, Horizon's certification in the MPRA Applications that an ASOP 27-compliant return assumption was only 6.75% for ten years and 7.5% thereafter given the Plan's dangerous, underfunded condition and need for liquidity evidences the imprudence of Defendants' high-risk asset allocation gamble.

Taken together these allegations are more than sufficient to support a plausible inference of imprudence, not just at the pleadings stage, but likely, as was the case in *Snitzer*, at the summary judgment stage as well.

### B. The District Court Erred in Holding that Plaintiff Failed to Plausibly Allege Horizon Acted as a Fiduciary

Plaintiff alleges that Horizon crossed the line from actuary to fiduciary under ERISA Section 1002(21)(A)(1) by its actions and advice in concert with the Trustees and Meketa in the imprudent high-risk asset management decisions. In holding that Plaintiff failed to plausibly allege Horizon acted as a fiduciary (JA-I-37-42), the

District Court failed to accept the specific well-pleaded facts and reasonable inferences in Plaintiff's favor required under Rule 12(b)(6) or apply the proper broad fact-intensive standard to determine whether Plaintiff plausibly alleged fiduciary status under ERISA.

### 1. Fiduciary Status Under ERISA is Broadly Construed and Requires a Fact-Intensive Inquiry

"Congress intended ERISA's definition of fiduciary to be broadly construed." *LoPresti v. Terwilliger,* 126 F.3d 34, 40 (2d Cir. 1997) (cleaned up). A person (including an entity) can acquire functional fiduciary status under ERISA by: (1) exercising discretionary authority or control over management of the plan or exercising control over disposition or management of plan assets; (2) rendering investment advice for a fee; or (3) having discretionary authority in plan administration. 29 U.S.C § 1002(21)(A)(1).

As explained in *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 262 (1993):

ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, thus expanding the universe of persons subject to fiduciary duties – and to damages…Professional service providers such as actuaries become liable for damages when they cross the line from adviser to fiduciary[.]

Consistent with *Mertens*, *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 538 (7th Cir. 1991), held:

there is no *per se* rule that prevents professionals [like actuaries] who render advice to an ERISA plan from becoming fiduciaries. As the Conference Committee Report and Labor Department regulations

indicate, the question of whether a consultant has or has not exercised such an unusual degree of influence over a Plan as to become a fiduciary involves factual determinations.

*Accord Gedek v. Perez*, 66 F. Supp. 3d 368, 383 (W.D.N.Y. 2014) (cleaned up) ("Whether a [person or entity] has fiduciary status, or has acted as a fiduciary, is for the most part a fact-intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss"); *Forgione v. Gaglio*, 2015 U.S. Dist. LEXIS 21644, at *22 (S.D.N.Y. 2015); *Bernhard v. Cent. Parking Sys. of New York, Inc.*, 282 F.R.D. 284, 288 (E.D.N.Y. 2012); 29 C.F.R.2509.75-5 at D-1.

### 2. Plaintiff Plausibly Alleges Horizon Crossed the Line from Actuary to Exercise Control and Provide Advice as a Fiduciary `in Plan Asset Management

The District Court erroneously concluded Plaintiff alleged that Horizon only provided routine actuarial services to the Trustees and Meketa and failed to support a plausible inference that: (1) Horizon exercised control in the asset allocation decision-making; or (2) that Horizon's advice for a fee in Plan asset management was provided pursuant to a mutual agreement, arrangement, or understanding that Horizon's advice would serve as a primary basis for the asset allocation decisions. JA-I-37-42.

As discussed above, Plaintiff's specific factual allegations support more than a reasonable inference that Horizon crossed the line from actuary to exercise control with respect to the Plan's asset management decisions. Horizon disregarded

applicable professional actuarial standards and the Plan's dangerous and deteriorating actuarial funded condition to inflate and maintain the 8.5% actuarial return assumption as a primary driver of the Plan's high-risk asset strategy and decisions. JA-I-34 (¶¶11, 35, 50-56, 111, 141).[28] Horizon, in effect, admitted doing so and keeping two sets of return assumption books by certifying in the Plan's MPRA benefit cut Applications that the ASOP 27-complaint return assumption was substantially lower than 8.5%. JA-I-49-50 (¶¶44-45); JA-VII-2007; JA-VIII-2065. Moreover, after Treasury approved the cuts, Horizon continued its active complicity in Plan asset management and abdication of professional standards by maintaining the inflated return assumption at 8.5% to support the continued high-risk asset gamble. 2018 5500. Further, internal plan documents support more than a reasonable inference that Horizon was complicit with the Trustees and Meketa in the high-risk asset management strategy based on Horizon's maintenance of the inflated long-term return assumption as a primary driver. JA-I-50, 54-57, 46 (¶¶47, 55-62, 32); *see supra* note 11. And as explained above, had Horizon refused to certify inflated actuarial return assumption, it would have set off alarm bells with regulators and Plan participants and likely prevented the Trustees and Meketa from maintaining the imprudent asset gamble as the Plan deteriorated for a decade. These allegations,

---

[28] In contrast, Milliman, the AFM plan's actuary, refused the AFM trustees' and Meketa's similar request to inflate Milliman's actuarial return assumption from 7.5% to 8.0%. JA-I-54-55 (¶56).

collectively, establish the requisite degree of control and participation in the asset allocation decisions to plausibly allege that Horizon functioned as a fiduciary.

The District Court's conclusion that Plaintiff failed to plausibly allege Horizon assumed fiduciary status in rendering investment advice for a fee, likewise, erroneously failed to comply with applicable Rule 12 standards and the required fact-intensive inquiry. A person qualifies as an ERISA fiduciary when they: (1) provide advice to the plan on a regular basis, pursuant to an arrangement with the plan that such advice will be (2) a primary basis for the investment of plan assets and (3) individualized to the particular needs of the plan. 29 CFR § 2510.3-21(c); *accord In re Beacon Assocs. Litig*., 282 F.R.D. 315, 335 (S.D.N.Y. 2012).

Citing paragraphs 10 and 11 of the Complaint, the District Court concluded that Plaintiff had alleged only that Horizon determined and provided the Trustees and Meketa with the 8.5% actuarial return assumption, which is nothing more than providing actuarial services. SA-41. But paragraph 11 alleges Horizon abdicated its professional duties and standards to "imprudently participate[] in providing investment advice to the Plan to chase the imprudent extremely high risk, high cost asset allocation." JA-I-38-39. As discussed above, beyond paragraphs 10-11, the Complaint alleges detailed facts reflecting Horizon's knowing departure from its role as independent actuary continuously to act a primary driver of the high-risk asset

management decisions, and the Trustees' and Meketa's continued understanding and reliance on Horizon's advice in maintaining the high-risk asset gamble.

The allegations of the Complaint, considered collectively, plausibly allege that unlike a routine provider of actuarial services, Horizon crossed the line to act as an ERISA fiduciary because it exercised control and undue influence, and provided advice, regarding the Trustees' and Meketa's bet-the-house investment strategy.

The District Court relied on *Forgione*, *Allen v. Credit Suisse Sec. (USA) LLC,* 895 F.3d 214 (2d Cir. 2018), *Walker v. Merrill Lynch & Co.,* 181 F.Supp. 3d 223 (S.D.N.Y. 2016), and *Apogee Enters. v. State St. Bank & Tr. Co.,* 2010 U.S. Dist. LEXIS 97716 (S.D.N.Y. 2010), in reaching its conclusion that Plaintiff failed to plausibly allege Horizon crossed the line from actuary to fiduciary in Plan asset management. SA-38-42. The cases are inapposite.

In *Forgione*, the complaint made only conclusory references to the actuary as "Plan Administrator" with no factual support. 2015 U.S. Dist. LEXIS 21644 at *25-28. The court concluded that conclusory allegations of "Plan Administrator" status do not make an actuary providing only actuarial services a fiduciary in plan administration. *Id.* at 28.

*Allen* involved claims that bank defendants functioned as ERISA fiduciaries in executing foreign exchange trade transactions requested by the plan's investment advisors. 895 F.3d at 224. Notably, this Court found "[n]o allegations [to] indicate

78

that [the banks] were able to exercise any control over the Plans' trustees' or investment managers' decisions to enter into the FX transactions with [the banks]." *Id.* at 225. Instead, this Court described the relationship between the banks and the plan as arms-length "salesmanship" with the banks matching the plan's desires conveyed by the plan's investment managers. *Id*. at 224.

*Walker* only alleged that Merrill Lynch merely submitted a roster of mutual funds to the trustees of a 401(k) plan, from which the trustees selected funds to make available to the plan participants. 181 F.Supp. 3d at 228. Because "the only factual allegations…[of investment advice] relate to Merrill Lynch's submission of a roster of mutual funds to the Plan trustees" (*id*. at 233), the court concluded that plaintiff "has not pled facts demonstrating that Merrill Lynch provided 'individualized investment advice' to the Plan; that it did so on a regular basis… or that the parties understood that the advice provided by Merrill Lynch would serve as a primary basis for the plan's investment decisions." *Id*. at 223-224 (cleaned up).

In *Apogee*, the plan trustees alleged that CitiStreet, which provided ministerial recordkeeping services, acted as a plan fiduciary even though the allegation there were similarly limited to CitiStreet providing investment reports to the plaintiff trustees. The court held that the complaint did not plausibly allege that the trustees hired CitiStreet "to render advice" for the plan's "investment decisions where plaintiffs hired other advisors to do so." 2010 U.S. Dist. LEXIS 97716 at *4-5.

In stark contrast to *Forgione*, *Allen*, *Walker*, *Apogee*, the Complaint here alleges detailed facts about how Horizon disregarded its professional responsibilities as actuary and crossed the line to exercise control over (or at least, per *Pappas*, "exercised such an unusual degree of influence") and provide advice with respect to the Plan's investment allocation decisions, as opposed to simply providing independent actuarial services, by (1) inflating its actuarial return assumption to match the Trustees' and Meketa's 8.5% target investment return to complicity allow them to pursue their excessively-risky asset allocation strategy; (2) serving as a driver of the asset allocation strategy; and (3) keeping two sets of books with respect to the actuarial return assumption in order to complicity allow the Trustees and Meketa to avoid scrutiny of their imprudent asset allocation. *See generally* Statement of the Case Sections G & I. Indeed, the Trustees represented to Plan participants: "Based on the best information and advice from [Horizon and Meketa] the Trustees have taken the necessary steps to ensure that there will be assts to pay pensions." JA-I-48-49 (¶¶39, 40). None of the cases relied on by the District Court had similar allegations.

### C. Defendants Breached Their Duty of Loyalty and Engaged in Prohibited Transactions

In *Cunningham v. Cornell*, the Supreme Court recently held:

The duty of loyalty "requires plan fiduciaries to act solely in the interest of the plan's participants and beneficiaries. § 1104(a)(l)(A). Among

other things, the duty of loyalty requires the fiduciary to deal fairly and honestly with beneficiaries.

Section 1106 supplements the ERISA fiduciary's general duty of loyalty to the plan's beneficiaries by categorically barring certain transactions deemed likely to injure the pension plan…[including] prohibited transaction[s] set out in §1106(a)(l)(C), which bars a fiduciary from causing the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

145 S. Ct. at 1026 (cleaned up). Also prohibited are any "transactions between [the] plan and [a] fiduciary" where a fiduciary "receive[s] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3); *see also Cunningham*, 145 S. Ct. at 1026 n.1.

The Trustees breached their duty of loyalty by engaging in prohibited transactions by hiring and retaining Meketa in a dual, conflicted role, which increased Meketa's compensation by more than $1 million/per year, and resulted in Meketa abandoning its independence in its role as independent investment advisor and making self-interested recommendations to make outsized EME/PE bets in to line its own pockets. The Trustees also breached their duty of loyalty by engaging in prohibited transactions in hiring and retaining Horizon even though Horizon abandoned its independence by complicitly manipulating its actuarial return assumption to support the Trustees' and Meketa's outsized bets in the highest-risk

asset classes. Meketa and Horizon, in their capacities as fiduciaries, similarly breached their duty of loyalty and engaged in prohibited transactions by negotiating and accepting money from the Plan as payment for their abandonment of their professional standards.

The allegations are more than sufficient to state a claim for breach of the duty of loyalty. *See, e.g., Donovan v. Bierwirth*, 680 F.2d 263, 271-272 (2d Cir. 1982) (ERISA "imposes a duty on the trustees to avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan" and concluding that pension plan trustees breached their duty of loyalty under ERISA by failing to resign when their positions as trustees came into conflict with their positions as corporate officers); *Popovchak v. UnitedHealth Grp. Inc.*, 692 F. Supp. 3d 392, 410-411(S.D.N.Y. 2023) quoting *Kohari v. MetLife Grp., Inc.*, U.S. Dist. LEXIS 136505, at *29 (S.D.N.Y. Aug. 1, 2022) (concluding that plaintiffs stated a claim for breach of fiduciary duty under ERISA by alleging that defendants "applied a disloyal preference" for certain investments to benefit from "excessive fees") and *Carrigan v. Xerox Corp.,* U.S. Dist. LEXIS 70428, at *28-29 (D. Conn. Apr. 18, 2022) (cleaned up) ("Plaintiffs' plausible claim that Defendants' decision-making process was imprudent, when combined with their allegations that

Defendants stood to benefit from the alleged imprudent and excessive fees, are enough to state a claim of disloyalty.").

In dismissing Plaintiff's breach of loyalty claims, the District Court relied on the district court decision in *Cunningham*. As discussed above, the Supreme Court recently reversed both the district court and this Court's decisions in *Cunningham* and held that even mere allegations that the plan trustees retained Fidelity and TIAA to perform routine record-keeping services, *without more*, stated a prohibited transaction claim. The District Court also relied on *Sacerdote I* and *Carrigan*, but failed to properly apply those decisions.

In *Sacerdote I*, the court held that a plaintiff states a breach of loyalty claim by alleging facts "that permit a plausible inference that the defendant engaged in transactions" that "create a conflict between the trustee's fiduciary duties and personal interests." 2017 U.S. Dist. LEXIS 137115, *15 (cleaned up). In *Carrigan*, the court held that while "allegations of affiliation do not state a claim for breach of the duty of loyalty *standing alone*, an allegation of such affiliation can be coupled with other circumstantial factual allegations to suggest plausibly that a fiduciary acted imprudently or disloyally," and refused to dismiss the loyalty claims because plaintiff alleged that the retention affiliated recordkeepers was the result of an imprudent process that did not include a request for proposal to other recordkeepers,

which "plausibly suggests that such decision was the result of a disloyal motivation."
2022 U.S. Dist. LEXIS 70428, at *27 (emphasis in original).

Plaintiff's allegations here easily satisfy those standards, and the facts here are
far more compelling than those in *Carrigan* and *Cunningham*, which sustained
loyalty and prohibited transaction claims. The allegations here are also far more
compelling than those in *Kohari* (cited by the District Court at SA-61-62).

The District Court cited *Brown v. Daikin Am., Inc*., 2021 U.S. Dist. LEXIS
85195 (S.D.N.Y. 2021), for the proposition that courts have dismissed loyalty claims
based on similar dual-role allegations. Besides being inconsistent with *Cunningham*,
the facts in *Brown* are distinguishable. There, the trustees of a defined contribution
401(k) plan hired John Hancock to perform routine recordkeeping services while
also making five Hancock proprietary funds available to plan participants (who also
had 25 non-Hancock funds to choose from). *Id*. at *3-6. The court held that those
facts, standing alone, did not plausibly show that plan fiduciary Daikin selected the
Hancock funds for the purpose of benefitting itself or John Hancock, particularly
since plan participants could choose from 25 non-Hancock funds and since Hancock
was not a plan fiduciary (and thus not a defendant). Here, Meketa was a Plan
fiduciary in two different, conflicted roles (and Horizon functioned as an ERISA
fiduciary) who was hired and retained by the Defendant Trustees in order to pursue
the Trustees' imprudent asset allocation investment strategy.

The District Court's citation to *McCaffree Fin. Corp. v. ADP, Inc*., 2023 U.S. Dist. LEXIS 56362, at *53–54 (D.N.J. 2023) is off point as well. In that case, service provider Voya, which had the alleged conflict of interest, was not a defendant or plan fiduciary. Only the plan sponsor/trustees were defendants/fiduciaries. That case simply held that a "plaintiff may not simply 'recast' a claim of imprudence [against a plan sponsor/trustee] as an independent claim of disloyalty without additional facts suggesting an improper motive or financial benefit." *Id*. at *56-57, quoting *Sacerdote I*, 2017 U.S. Dist LEXIS 137115 at *14.[29] Here Meketa was a Plan fiduciary for two separate, conflicted roles and Plaintiff provided the necessary additional facts including quantifying Meketa's financial incentive, detailing Meketa's course of conduct with the IAM and AFM funds, and explaining how Meketa de-risked its EME/PE bets with its own funds and for other funds where it had no financial incentive.

The District Court's view that "the Complaint contains only generalized allegations that Meketa had a conflict of interest and sought a dual role for the

---

[29] The District Court failed to recognize that there is a "split in authority over whether a plausible prudence claim can be pled alongside a parallel loyalty claim." *See Berkelhammer v. Automatic Data Processing, In*c., 2022 U.S. Dist. LEXIS 150967, *30 (D.N.J. 2022). In *Berkelhammer*, the court held that "the exorbitant fees paid to Voya, the sheer consistency at which Defendants benefited Voya, and the mutually beneficial business relationship between Defendants and Voya—are sufficient to allow the Court to draw the plausible inference that Defendants intended to benefit Voya." *Id*. at *33. The facts are far more compelling here.

purpose of increasing its fees" (SA-48) is simply wrong and ignores that the DOL and Proskauer believed Meketa's dual role created a conflict of interest inconsistent with ERISA.[30]

With respect to Horizon, it is hard to imagine a more disloyal action by a pension plan actuary than keeping two sets of books and misleading the Treasury Department, PBGC and the Plan participants regarding the actuarial funding of the Plan. Horizon not only exercised control in the imprudent asset management gamble contrary to the interests of the Plan and the participants when it was being paid to be an independent enrolled actuary, it also controlled the actuarial funding information provided to the participants, which overstated the safety of pensions by Horizon's inflation of the return assumption.

### D.    Co-Fiduciary Liability

"ERISA…renders a fiduciary liable for the breach of another fiduciary if he or she (1) participates knowingly in, or knowingly undertakes to conceal, and act or omission of such other fiduciary, knowing such act or omission is a breach; or (2)

---

[30] The District Court ignored those allegations in it analysis. In summarily dismissing the loyalty claim, it stated that the Complaint "does not…contain any facts indicating when Meketa made the pitch, i.e., before or after Defendants began pursuing the allocation strategy at issue, what Meketa offered when making the 'pitch,' who made the hiring decision, or what the terms were involved in Meketa's hiring in a second role." JA-I-46. While those details are largely irrelevant, they are all in the Complaint, which makes clear the Trustees hired Meketa in the dual conflicted role no later than 2011 in order to pursue the outside asset allocation to PE and EME.

enables another fiduciary to commit a breach; or (3) has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts to remedy the breach." *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 367 (S.D.N.Y. 2009) (citing 29 U.S.C. § 1105(a)). Because the Complaint states a viable breach of fiduciary duty claim, and because the Defendant fiduciaries all participated in the breaches alleged in the Complaint and took no steps to remedy those breaches, the Complaint states viable Co-Fiduciary Liability claims.

## CONCLUSION

The District Court committed plain and unequivocal error when it dismissed Plaintiff's Complaint. Accordingly, this Court should reverse.

Dated:      May 12, 2025            Respectfully Submitted,

/s/ *Steven A. Schwartz*
Steven A. Schwartz
**CHIMICLES SCHWARTZ KRINER**
  **& DONALDSON-SMITH LLP**
361 West Lancaster Avenue
Haverford, PA 19041
Tel.: 610-642-8500
Fax: 610-649-3633
sas@chimicles.com

and

Robert J. Kriner, Jr.
**CHIMICLES SCHWARTZ KRINER**
  **& DONALDSON-SMITH LLP**
2711 Centerville Road, Suite 201

Wilmington, DE 19808
Tel:  302-656-2500
Fax: 302-656-9053

*Counsel for Plaintiff-Appellant Robert
Carlisle and the Proposed Class*

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains less than the 21,000 word limit approved by the Court, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the word count of Microsoft Word. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Steven A. Schwartz*
Steven A. Schwartz

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 12, 2025, a true and correct copy of the foregoing was filed via the Court's ECF system and served on all parties or their counsel of record.

<u>/s/ Steven A. Schwartz</u>
Steven A. Schwartz